391 F.2d 555
 Morton EISEN, on behalf of himself and all other purchasers
and sellers of 'odd-lots' on the New York Stock
Exchange similarly situated, Plaintiff-Appellant,
v.
CARLISLE & JACQUELIN and DeCoppet & Doremus, each limited
partnerships underNew York Partnership Law,
Article 8 and New York Stock Exchange,
anunincorporated association,
Defendants-Appellees.
 No. 78, Docket 30934.
 United States Court of Appeals Second Circuit.
 Argued Nov. 6, 1967.
Decided March 8, 1968.
 
 William E. Haudek, New York City (Robert Zicklin, Richard M. Meyer, Laventhall & Zicklin and Pomerantz, Levy, Haudek & Block, New York City, on the brief), for plaintiff-appellant.
 Devereux Milburn, New York City (Louis L. Stanton, Jr. and Carter, Ledyard & Milburn, New York City, on the brief), for defendant-appellee Carlisle & Jacquelin.
 Francis S. Bensel, New York City (Bud G. Holman, J. Portis Hicks, Kelley, Drye, Newhall Maginnes & Warren, New York City, on the brief), for defendant-appellee DeCoppet & Doremus.
 William E. Jackson, New York City (A. Sidney Holderness, Jr., Russell E. Brooks, and Milbank, Tweed, Hadley & McCloy, New York City, on the brief), for defendant-appellee New York Stock Exchange.
 Before LUMBARD, Chief Judge, and MEDINA and HAYS, Circuit Judges.
 MEDINA, Circuit Judge:
 
 
 1
 On this appeal we are presented with significant questions involving the interpretation of recently amended Rule 23 of the Federal Rules of Civil Procedure. Morton Eisen instituted this action seeking damages and injunctive relief on behalf of himself and all other purchasers and sellers of 'odd-lots' on the New York Stock Exchange against Carlisle & Jacquelin and DeCoppet & Doremus, alleging that the two brokerage firms had combined and conspired to monopolize odd-lot trading, and had fixed the odd-lot differential at an excessive amount in violation of the Sherman Act. 15 U.S.C. Sections 1, 2. A third count alleged that the defendant New York Stock Exchange had failed to discharge its duties under the Securities Exchange Act of 1934 by neglecting to adopt rules protecting investors in odd-lots. 15 U.S.C. Section 78f(b), 78f(b), 78s(a).
 
 
 2
 Following a motion by defendants for a determination pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure, Judge Tyler held that the suit could not be brought as a class action. Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147 (S.D.N.Y.1966). A motion to dismiss the present appeal because the decision below constituted a non-final order has previously been denied by this Court. Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966), cert. denied 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967). In dismissing the class action the District Court found that plaintiff failed to demonstrate that he would be able fairly and adequately to protect the interests of the class, Fed.R. Civ.P. 23(a)(4); that the notice required by due process and the rule, Fed.R. Civ.P. 23(c)(2), could not be given and that questions common to the class did not predominate over questions affecting individual members. Fed.R. Civ.P. 23(b)(3).
 
 
 3
 At the outset, it is necessary briefly to describe the mechanics of odd-lot trading on the New York Stock Exchange. The regular unit of trading on the Exchange is the 'round lot' of 100 shares. An 'odd-lot' is the term used to designate transactions involving less than 100 shares. Odd-lot orders do not form part of the 'regular auction market' but are exclusively handled by special odd-lot dealers who buy and sell for their own account as principals. In order to purchase or sell an odd-lot an individual first contacts a brokerage firm which then places an order with the odd-lot dealer. The cost to the customer includes both a standard commission payable to the brokerage firm and the odd-lot differential which is received by the odd-lot dealer. The differential is a figure amounting to a fraction of a point for each share traded, which is added to the customer's purchase price and deducted from the sale price. During the period of time in which plaintiff had alleged he was involved in the odd-lot market, covering the years 1960-1966, the differential was 1/8th of a point (12 1/2 cents) per share on stock selling below $40 per share and 1/4 of a point (25 cents) per share on stock selling at $40 or above per share.[1] Over the years odd-lot trading has accounted for a fairly steady percentage of the total volume on the Stock Exchange, ranging from a high of 12.9% In 1937 to a low of 7.9% In 1950 and 1958. For example, recent figures indicate that in 1961 the volume of odd-lot transactions totalled 214,018,834 shares. SEC, Report of Special Study of Securities Markets, H.R.Doc. No. 95, Pt. 2, 88th Cong. 1st Sess. 171-202, 393 (1963), hereinafter cited as SEC Special Study. Defendants Carlisle & Jacquelin and DeCoppet & Doremus are engaged exclusively in odd-lots and collectively they handled 99% Of the volume in odd-lot transactions. SEC Special Study at 172. Various alleged abuses in odd-lot trading disclosed by the SEC in 1963, form, in large part, the basis of the present action. See SEC Special Study at 171-202.
 
 I.
 
 4
 Class actions serve an important function in our judicial system. By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation. Nevertheless, Rule 23 of the Federal Rules of Civil Procedure, as it was originally enacted, did not effectively achieve either of the above two objectives. Class actions were divided into various categories reflecting the 'jural relationships of the members of the class.' See 3 Moore, Federal Practice par. 23.08 at 3434 (2d ed. 1953). Only after a determination of the nature of the rights: 'joint, common or secondary' in the true class action, 'several related to specific property' in the hybrid class action, and 'several affected by a common question and related to common relief' in the spurious class action, was a court able to proceed. Advisory Committee's Note, Proposed Rules of Civil Procedure, 39 F.R.D. 98 (1965), hereinafter cited as Advisory Committee's Note. There were significant differences in the res judicata effects accorded to the various class actions. Thus while a judgment in a true class action was binding on the entire class, the spurious class action only concluded the rights of parties. 3 Moore, Federal Practice par. 23.11 at 3472 (2d ed. 1953). Since the great majority of cases fell into this latter category, the objective of determining all questions in one suit was effectively frustrated. In essence, the spuriour class action was interpreted as merely a permissive joinder device.[2] See Carroll v. American Federation of Musicians, 372 F.2d 155 (2d Cir. 1967); Fox v. Glickman Corp., 355 F.2d 161 (2d Cir. 1965), cert. denied 384 U.S. 960, 86 S.Ct. 1585, 16 L.Ed.2d 672 (1966); Nagler v. Admiral Corp., 248 F.2d 319 (2d Cir. 1957); Oppenheimer v. F. J. Young & Co., 144 F.2d 387 (2d Cir. 1944). But see Weeks v. Bareco Oil Co., 125 F.2d 84 (7th Cir. 1941) (dictum).
 
 
 5
 To avoid the problems associated with the original rule the Advisory Committee on the Rules of Civil Procedure has completely redrafted Rule 23 in order to provide a thoroughly flexible remedy. Throughout the course of a proceeding courts are given complete control to give assurance that the procedures adopted are fair, reasonable and effective. All actions will result in judgments binding on the entire group of individuals found by the court to be members of the class. Fed.Rule C.P. 23(c)(3). While the new concepts incorporated in the rule have not as yet been passed upon by any federal Court of Appeals,[3] they have received somewhat less than an enthusiastic reception in the District Courts. Compare School District of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa.1967), expressing grave doubts about the propriety of a rule which binds absent but described class members, with Siegal v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal. 1967) which upholds a class action brought by 5 franchise dealers on behalf of a class of over 700 dealers, alleging anti-trust violations. Nevertheless, the majority of courts have upheld that validity of representative actions brought under the new rule. See, e.g., Van Gemert v. Boeing Co., 259 F.Supp. 125 (S.D.N.Y.1966); Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966); Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y.1966); Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673 (N.D.Indiana 1966); Booth v. General Dynamics Corp., 264 F.Supp. 465 (N.D.Ill.1067). But see Richland v. Cheatham, 272 F.Supp. 148 (S.D.N.Y.1967); Hohmann v. Packard Instrument Co., 43 F.R.D. 192 (N.D.Ill.1967); Jacobs v. Paul Hardeman, Inc., 42 F.R.D. 595 (S.D.N.Y.1967); Berger v. Purolator Products, Inc., 41 F.R.D. 542 (S.D.N.Y.1966). Although representing a totally different approach to class actions, the new rule does retain two standards which were embodied in the old rule, namely, the class must be so numerous as to make it impracticable to bring every member before the court, and the representative party must be able fairly and adequately to protect the interests of the entire class. Necessarily the old case law will furnish some guidance in defining these concepts.
 
 II.
 
 6
 To be maintainable as a class action a suit must meet all the requirements set forth in Section 23(a)[4] and also fall within one of the subsections of 23(b).[5]
 
 
 7
 Plaintiff has alleged that he was engaged in odd-lot trading during the years 1960-1966. Though estimates of the number of class members similarly engaged in this activity during those years have varied, all the litigants concede 'the class is so numerous that joinder of all members is impracticable.' Fed.R.Civ.P. 23(a)(1). Defendants' 'rough approximation, not disputed by plaintiff, would place 3,750,000 individual and corporate buyers and sellers of odd-lots in the class. Similarly, the allegation that a conspiracy, whose object was to charge excessive rates on odd-lot transactions existed between the two brokerage firms, satisfies the requirement that there be 'questions of law or fact common to the class.' Fed.R.Civ.P. 23(a)(2). Furthermore, plaintiff's claim is 'typical of the claims * * * of the class.' Fed.R.Civ.P. 23(a)(3). Although there are varying fact patterns underlying each individual odd-lot transaction, the same allegedly unlawful differential is charged to all buyers and sellers. However, defendants have argued that different members of the class will have varying theories as to what constitutes the 'excessive price,' and other class members may be satisfied with the present price policy.[6] Nonetheless, all members of the class, including those who would otherwise prefer to abide by the status quo, will be helped if the rates are found to be excessive.
 
 
 8
 Inability on the part of the plaintiff to 'fairly and adequately protect the interests of the class,' Fed.R.Civ.P. 23(a)(4), was considered by the District Court to be one of the primary reasons for dismissing the class action. We believe the court employed incorrect standards in reaching this result.
 
 
 9
 Since Eisen had not alleged with specificity the nature of his various odd-lot transactions, the court below felt it lacked sufficient information properly to assess his qualifications as a representative, and, even if such information were alleged, 'the diverse rights and interests of other members of the claimed class plainly could not be reasonably protected by plaintiff in this litigation.' Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147, 150 (S.D.N.Y.1966). The District Judge also felt it was impossible to assume that plaintiff 'alone with a comparatively minuscule and limited interest in odd-lot transactions' could represent a class numbering at least in the hundreds of thousands, which encompassed individuals with much larger and different interests. Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147, 151 (S.D.N.Y.1966).
 
 
 10
 Traditionally, courts have expressed particular concern for the adequacy of representation in a class suit because the judgment conclusively determines the rights of absent class members. See Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Of course, understandably, the standards for representation under the old spurious class action were not as rigorously enforced, due to the minimal res judicata effects given to the judgments in these suits. See Oppenheimer v. F. J. Young & Co., 144 F.2d 387 (2d Cir. 1944). However, as a result of the sweeping changes in Rule 23, a court must now carefully scrutinize the adequacy of representation in all class actions.
 
 
 11
 What are the ingredients that enable one to be termed 'an adequate representative of the class?' To be sure, an essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved in a collusive suit or that plaintiff has interests antagonistic to those of the remainder of the class. See Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Courts, on occasion, have also required that the interest of the representative party be coextensive with the interest of the entire class, but this amounts to little more than an alternative way to stating that the plaintiff's claim must be typical of those of the entire class, an element we have already discussed. See Richland v. Cheatham, 272 F.Supp. 148 (S.D.N.Y.1967). However, we believe that reliance on quantitative elements to determine adequacy of representation, as was done by the District Court, is unwarranted. Language to the effect that a small number of claimants cannot adequately represent an entire class has frequently been cited, see, e.g., Pelelas v. Caterpillar Tractor Co., 113 F.2d 629 (7th Cir.), cert. denied 311 U.S. 700, 61 S.Ct. 138, 85 L.Ed. 454 (1940), but we fail to understand the utility of this approach. If class suits could only be maintained in instances where all or a majority of the class appeared, the usefulness of the procedure would be severely curtailed. As has previously been stated, one of the primary functions of the class suit is to provide 'a device for vindicating claims which, taken individually, are too small to justify legal action but which are significant size if taken as a group.' Escott v. Barchris Construction Corp., 340 F.2d 731, 733 (2d Cir. 1965), cert. denied 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1966). Individual claimants who may initially be reluctant to commence legal proceedings may later join in a class suit, once they are assured that a forum has been provided for the litigation of their claims. See Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967). But to dismiss a class suit in its incipiency before claimants have been given an effective opportunity to join would be a disservice to the class action as envisioned in the new rule. Indeed, we hold that the new rule should be given a liberal rather than a restrictive interpretation, Escott v. Barchris Construction Corp., 340 F.2d 731, 733 (2d Cir. 1965), cert. denied 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1966), and that the dismissal in limine of a particular proceeding as not a proper class action is justified only by a clear showing to that effect and after a proper appraisal of all the factors enumerated on the face of the rule itself.
 
 
 12
 We are not persuaded that it is essential that any other members of the class seek to intervene. Absent class members will be able to share in the recovery resulting in the event of a favorable judgment, and, if they wish to avoid the binding effect of an adverse judgment they may in various ways and at various times that we need not now attempt to particularize, attack the adequacy of representation in the initial action or disassociate themselves from the case. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); see Weinstein, Revision of Procedure: Some Problems in Class Actions, 9 Buffalo L.Rev. 433, 436 (1960). If we have to rely on one litigant to assert the rights of a large class then rely we must. The dismissal of the suit out of hand for lack of proper representation in a case such as this is too summary a procedure and cannot be reconciled with the letter and spirit of the new rule.
 
 
 13
 Necessarily, a different situation is presented where absent class members inform the court of their displeasure with plaintiff's representation, see Hess v. Anderson, Clayton & Co., 20 F.R.D. 466 (S.D.Cal.1957), but the representative party cannot be said to have an affirmative duty to demonstrate that the whole or a majority of the class considers his representation adequate. Nor can silence be taken as a sign of disapproval.[7]
 
 
 14
 It is also worthy of note that the rule contains provisions which, by themselves, are designed to insure proper representation. For example, 23(e) requires court approval of a settlement, thus minimizing the danger that the rights of the class will be unfairly compromised. Accordingly, we decide that the District Court should reconsider the adequateness of plaintiff's representation in the light of the standards which we have set forth in this opinion.[8]
 
 III.
 
 15
 In addition to complying with the requirements of Section (a) of Rule 23, a potential class action must also satisfy the requirements of one of the three subsections of 23(b).[9] Plaintiff has argued that the present action is maintainable under all three subsections of 23(b). However, we believe both 23(b)(1)(A)[10] and 23(b)(2) are not applicable to the present factual situation. Subsection (b)(1)(A) authorizes a class action if 'the prosecution of separate actions by or against individual members would create a risk of * * * inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class.' Plaintiff has effectively rebutted his own argument because he admits that individual actions could not be brought as the small claimants who constitute the entire class could not, on an individual basis, afford the expense of lengthy anti-trust litigation. Under these circumstances there is little danger that individual suits will establish 'incompatible standards of conduct' for the defendants. Subsection (b)(2) was never intended to cover cases like the instant one where the primary claim is for damages, but is only applicable where the relief sought is exclusively or predominantly injunctive or declaratory. Advisory Committee's Note at 102.
 
 
 16
 We must also note that plaintiff's effort to qualify the action under 23(b)(1) and 23(b)(2) was induced by his erroneous theory that notice is not 'mandatory' under these sections. This theory is based on the assumption that 23(c)(2)[11] provides the only 'mandatory' notice required by the new rule. Since this particular section refers exclusively to actions brought under 23(b)(3), other suits cognizable under either 23(b)(1) or 23(b)(2) would only be subject to 'discretionary' notice under 23(d)(2).[12] Nevertheless, we hold that notice is required as a matter of due process in all representative actions, and 23(c)(2) merely requires a particularized form of notice in 23(b)(3) actions. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Advisory Committee's Note at 107.
 
 
 17
 Ultimately plaintiff must fall back on subsection (b)(3), which in effect corresponds to the old spurious class action. Presumably influenced by the same thinking which relegated the old spurious class action to the position where it was used primarily as a device for permissive joinder, the Advisory Committee has commented that 'class action treatment is not as clearly called for (in (b)(3) situations) but it may nevertheless be convenient and desirable depending upon the particular facts.' Advisory Committee's Note at 102. A court, under this subsection, is thus required to find that the questions of law or fact common to the class predominate over questions affecting individual members and that the class action is 'superior to other available methods for the fair and efficient adjudication of the controversy.' Fed.R.Civ.P. 23(b) (3). Moreover, resolution of the issue concerning the propriety of a suit under 23(b)(3) involves an assessment of various factors, including among others, '(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum'; and '(D) the difficulties likely to be encountered in the management of a class action.' Fed.R.Civ.P. 23(b)(3).
 
 
 18
 The District Court felt 'the tremendous size of the asserted class, the fact that there is no evidence that any other member has the slightest interest in this litigation' and the 'varied nature and quantum of the interests of other odd-lot purchasers and sellers' necessarily compelled a finding that questions affecting individual members predominated over questions common to the entire class. Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147, 152 (S.D.N.Y.1966).
 
 
 19
 However, under both the old and the amended rule 23, anti-trust violations practised upon large groups of individuals have been held to involve sufficient common questions of law or fact to merit treatment as class actions. Kainz v. Anheuser-Busch, Inc., 194 F.2d 737 (7th Cir.), cert. denied 344 U.S. 820, 73 S.Ct. 17, 97 L.Ed. 638 (1952) (old rule); City of Philadelphia v. Morton Salt Co., 248 F.Supp. 506 (E.D.Pa.1965) (old rule); Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967) (new rule); but see School District of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa.1967) (new rule). The Advisory Committee has specifically noted that 'concerted anti-trust violations may involve' predominantly common questions. Advisory Committee's Note at 103. Suits alleging violations of Section 10(b) of the Securities Exchange Act, though often involving separate consideration of the elements of misrepresentation and reliance as they affect individual members, have also been accorded treatment as class actions under the new rule. Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966); Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y.1966); Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673 (N.D.Indiana 1966); but see Berger v. Purolator Products, Inc., 41 F.R.D. 542 (S.D.N.Y.1966).
 
 
 20
 We realize that members of the proposed class might have had different motives when they entered into the odd-lot market.[13] We are also mindful of the fact that there may be a wide variety of orders some of which may require special handling by the odd-lot dealer.[14] Nevertheless, the alleged underlying conspiracy does contain a socalled 'common nucleus of operative facts.' Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967). All of these differences among the class members bear only on the computation of damages, a factor which, by itself, does not justify dismissal of the class action. Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y.1966); City of Philadelphia v. Morton Salt Co., 248 F.Supp. 506 (E.D.Pa.1965). Potential rivalry between class members after an initial finding of liability can be adequately handled since the rule gives a court the power to divide the class into appropriate subclasses or to require the members to bring individual suits for damages. Fed.R.Civ.P. 23(c)(4); Advisory Committee's Note at 106. Even if individual questions arise during the course of litigation, which render the action 'unmanageable,' the court still has the power at that time to dismiss the class action and permit the plaintiff to proceed only on behalf of himself. Fed.R.Civ.P. 23(c)(1). Therefore, at this early stage of the proceedings, we find there has been an adequate demonstration that common questions of law or fact predominate over individual questions. See Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y.1966).
 
 
 21
 Before allowing suit to proceed under 23(b)(3) the trial court must also find that a 'class action is superior to other available methods for the fair and efficient adjudication of the controversy.' Although defendants argue that intervention and permissive joinder[15] are both superior to a class action, implicit in Judge Kaufman's prior opinion above referred to, denying defendants' motion to dismiss the appeal for lack of jurisdiction, is the assumption that the only feasible way to litigate these claims is by a class action.[16] The odd-lot differential payable on any one transaction under the rate schedule in effect at the time the complaint was filed ranged from 12 1/2 cents to $24.75.[17] Plaintiff engaged in 47 odd-lot transactions between 1960 and 1966 paying a total of $259 in odd-lot differentials. Recognizing the nature of the odd-lot differential and the type of investors who often engage in these transactions, we think it highly unlikely that any one potential plaintiff would have sustained sufficient damages to warrant, as a practical matter, individual prosecution of his claim.[18] Thus the present case appears to fall within that class of cases in which 'the interests of individuals in conducting separate lawsuits' are more 'theoretic than practical' since 'the amounts at stake for individuals (are) * * * so small that separate suits would be impracticable.' Advisory Committee's Note at 104. This belief is reinforced by the fact that there is no other pending litigation dealing with the subject matter of this suit. In any event, we are bound by Judge Kaufman's ruling as the law of this case.
 
 
 22
 Bearing in mind the desirability of providing small claimants with a forum in which to seek redress for alleged large scale anti-trust violations,[19] we are still reluctant to permit actions to proceed where they are not likely to benefit anyone but the lawyers who bring them. Concededly, the damages for individual class members will be small and the posibility remains that the amount expended on the paper work which would be necessary in order to file and prove a claim may exceed the amount of damages sustained. On the other hand, courts in the past have been able to fashion procedures in order to deal with the distribution of millions of dollars in damages to thousands of small claimants. See Kalven & Rosenfield, The Contemporary Function of the Class Suit, 8 Univ. of Chicago L.Rev. 684, 686 (1941).[20] Moreover, in the present case there is apparently no public administrative body that could ensure repayment, so the responsibility must ultimately rest on the judicial system. See Comment, Recovery of Damages in Class Actions, 32 Univ. of Chicago L.Rev. 768, 785 (1965).
 
 
 23
 Before allowing the suit to proceed, a further inquiry by the District Court is necessary in order to consider the mechanics involved in the administration of the present action. Defendants may be able to present data indicating that in analogous situations large sums have been absorbed by paper work, fees of Special Masters, printing, postage and so on. Procedures should be outlined with regard to possible intervention by other class members and provisions by for the filing of claims. The court should explore the problems which individual class members would be likely to encounter in filing and proving their claims. If as a practical matter class members are not likely ever to share in an eventual judgment, we would probably not permit the class action to continue. There may conceivably be questions of jurisdiction or venue, as well as of demands for a jury trial.
 
 
 24
 In view of the arguments previously discussed relating to the necessity for separate computation of damages because of the variety of services performed by the defendant-dealers, it is not inconceivable that the District Court on remand may conclude that these separate questions present insuperable problems of judicial administration sufficient to justify the dismissal of the action.[21] However, we do not express any opinion on this subject and we simply note that other courts in similar cases have been able to set up formulas of procedure for recovery that are applicable to an entire class. See, e.g., Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir. 1961), petition for cert. dismissed 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). The court may also find that it is too early in the proceedings adequately to determine potential damage questions and hence that a decision on the propriety of a class action may have to be postponed.
 
 IV.
 
 25
 The notice requirement of 23(c)(2), as recognized by Judge Tyler, presents what may turn out to be the most serious obstacle to the maintenance of the present action. Subsection 23(c)(2) provides:
 
 
 26
 'In any class action maintained under (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member ahat (A) the court will exclude him from that class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion, may, if he desires, enter an appearance through his counsel.'
 
 
 27
 The District Judge held that 'both the Rule and concepts of due process require individual notice for the class members who can be identified.' Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147, 151 (S.D.N.Y.1966). As a result of 'practical financial limitations' present in the instant case, he was of the opinion that the notice requirement could not be met. Publication plus the mailing of individual notice to stock exchange member firms was rejected as a possible alternative method.
 
 
 28
 While the Supreme Court has recognized that class actions represent an exception to the general rule under which only parties are bound by a judgment, the procedure adopted must conform to the requirements of due process and fairly insure the protection of absent parties who are to be bound. Hansberry v. Lee, 311 U.S. 32, 42, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Notice, as an integral part of due process must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them on opportunity to present their objections.' Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The Advisory Committee in its note has suggested that the mandatory notice pursuant to 23(c)(2) and the discretionary notice under 23(d)(2)[22] were intended to fulfill the requirements of due process established in Hansberry and Mullane. Advisory Committee's Note at 107. The Advisory Committee also sought to ensure that individual interests would be respected in (b)(3) cases by giving class members the opportunity to avoid being bound by the judgment if they requested exclusion and so informed the court.
 
 
 29
 The task of furnishing notice to the class members in such a case as this must rest upon the representative party when he is the plaintiff.[23] Appellant has argued that mail notice to the entire class would cost approximately $400,000, and, therefore, must be deemed impracticable within the context of 23(c)(2). Consequently, a decision requiring such notice would effectively foreclose all opportunity to secure relief. Plaintiff contends that publication is 'the best notice practicable under the circumstances.' On the other hand, defendants suggest that cost considerations should not prevent many class members from receiving the individual notice they are entitled to both by the requirements of due process and by the terms of 23(c)(2), since their identities are 'very easily ascertainable,' Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962).
 
 
 30
 The District Courts have been inconsistent in their interpretations of the notice requirement under the new rule. One opinion reads 23(c)(2) as requiring that actual notice be given to all absent class members, Richland v. Cheatham, 272 F.Supp. 148 (S.D.N.Y.1967), while another has permitted a representative to use notice by publication to inform an entire class in a taxpayer's suit. Booth v. General Dynamica Corp., 264 F.Supp. 465 (N.D.Ill.1967). See also Harris v. Jones, 41 F.R.D. 70 (D.C.Utah 1966), requiring individual notice to be given to 1500 class members in an action for violation of Rule 10b-5 of the Securities Exchange Act because all the names and addresses were on file and available.
 
 
 31
 On the record before us we cannot arrive at any rational and satisfactory conclusion on the propriety of resorting to soem form of publication as a means of giving the necessary notice to all members of the class on behalf of whom the action is stated to be commenced and maintained. But we assume that some sort of ritualistic notice in small print on the back pages of a newspaper would in no event suffice. Not only did the court below fail to analyze and give proper consideration to the standards set forth in 23(c)(2); there was also a lack of evidentiary basis for the findings necessary to support rulings of what would or would not amount to compliance with the requirements of due process and with the provisions of 23(c)(2) to which reference has already been made.
 
 
 32
 Can any members of the class be identified through reasonable effort so that such persons may be given individual notice? Without an evidentiary hearing we do not see how this question can be answered. And, until it is answered, how is one to give any rational consideration to the question of what notice by publication would be deemed appropriate, what should be stated in the notice, and who is to take on the burden of answering the large number of written and oral inquiries by members of the class?
 
 
 33
 The affidavits before us are conclusory in character and they merely scratch the surface. For example, a general partner in Carlisle & Jacquelin in his affidavit states that there is no way in which his firm could identify the odd-lot customers.[24] Similarly, a general partner in a large member firm on the New York Stock Exchange declares that there is no ready way to separate odd-lot customers from round lot customers and that to determine which customers had odd-lot transactions in recent years would require sorting of approximately 300,000 to 400,000 names of customers.[25] Finally a general partner in another large member firm expresses his belief that there is no way of obtaining exact information about odd-lot transactions without analyzing the history of each account, a task which would be 'virtually impossible.'[26] Nevertheless, both on argument and as part of their briefs, defendants have argued that 'many (odd-lot customers) can, in fact be identified through the appellee firms and the brokerage houses.'
 
 
 34
 On remand the court may find that the names of certain class members, because of their widespread dealings in odd-lots, may be readily ascertainable. Arguably these class members may possess enough of a stake in the proceedings to justify personal intervention. At this point the court will then have to consider once again the question of publication. Under certain circumstances published notice may amount to the 'best notice practicable,' particularly where requirement of a different form of notice would, in effect, prevent potentially meritorious claims from being litigated. In this connection we must note that in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), the party required to furnish individual notice was a large banking institution and not a small individual claimant. Similarly, in other cases publication has been rejected as insufficient notice where it was sought to be used by the City of New York, Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962), the New Haven Railroad, City of New York v. New York, New Haven & Hartford R.R., 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953) and the City of Hutchinson, Kansas, Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956). Nevertheless, if the court finds that a considerable number of members of the class can be identified with reasonable effort, and financial considerations prevent the plaintiff from furnishing individual notice to these members, there may prove to be no alternative other than the dismissal of the class suit.
 
 
 35
 It may be that in some situations it is better at the outset to decide that the proceeding may be prosecuted as a class action and leave for later resolution some of the debatable matters, such as the sufficiency of the representation or the notice to be given, or the feasibility of meeting problems of judicial administration. In this particular case, with its millions of possible claimants, we think it would be most amiss to let the case go ahead until it becomes hopelessly entangled in a mass of procedural detail and expense from which it may not be easy or even possible to extricate it with justice to the parties by the simple means of deciding at a later day that the order permitting the case to proceed as a class action was improvidently granted.
 
 
 36
 Finally, it is worthy of note that in dismissing the action as one including 'a myriad of complex, frustrating, needless problems in attempted management' the District Court in School Dist. of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001, 1006, commented that, prior to the dismissal there had been 'numerous hearings and conferences.'
 
 
 37
 Accordingly, the order appealed from is reversed; we retain jurisdiction, and the case is remanded for a prompt and expeditious evidentiary hearing, with or without discovery proceedings, on the questions of notice, adequate representation, effective administration of the action and any other matters which the District Court may consider pertinent and proper.
 
 LUMBARD, Chief Judge (dissenting):
 
 38
 It seems to me that we should affirm Judge Tyler's ruling that this is not a proper class action because it is so clearly right on two counts: the impossibility of the plaintiff giving suitable notice and the unmanageability of this suit as a class action. I would not remand to the district court to do the obvious and the unnecessary.
 
 
 39
 What could be less of a class action than a suit where there are more than 3,750,000 potential plaintiffs living in every state of the union and in almost every foreign country? If this is a 'class,' it is so large and indiscriminate that a substantial proportion of its membership will have no idea whatever that they belong to it. Just how a notice can be worded which could alert so large a 'class' to the possibility that proceedings in the Sonthern District, if carried forward, would someday enrich each one by a few dollars, if there be anything left after expenses and attorneys' fees, is a mystery to me.
 
 
 40
 Indeed, the question of how to give any notice which would be sufficient to meet constitutional requirements is so impossible of solution that my colleagues choose to ignore it.
 
 
 41
 If the plaintiff, who has participated in some 47 transactions over a period of years, estimates his damages at only $70, is it not evident that the overwhelming majority of all possible plaintiffs would expect at best to receive considerably less than $70? And what is sufficiently interesting about the expectation of such a recovery, available if at all, only after several years of litigation, to lead us to suppose that any considerable number would bother to respond to the notice. Despite articles in the May 3, 1966 edition of the New York Times and the May 4, 1966 edition of the Wall Street Journal no one has joined Eisen in this action. See Berger v. Purolator Products, Inc., 41 F.R.D. 542, 544 (S.D.N.Y.1966). Obviously the only persons to gain from a class suit are not potential plaintiffs, but the attorneys who will represent them.
 
 
 42
 In any event, plaintiff suggests no way in which he can give notice to his 3,750,000 potential brothers-in-litigation which could conceivably attract the attention of any appreciable number of them. Who is to advise foreign class members who do not read or understand English, and how is this to be done? Who is to pay for class notice, and for the subsequent notice of any step in the action which the Rule says must be given?
 
 
 43
 To me, these illustrations of the practical and insurmountable difficulties that would be encountered in administering this action as a class suit underscore that Judge Tyler could only have exercised his discretion as he did. As a class action the claim is totally unmanageable. See School District of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa., 1967).
 
 
 44
 Even if all of the difficulties inherent in the administration of the suit were overcome, the amount expended in filing and processing claims would probably exceed any recovery. Illinois Bell Telephone Co. v. Slattery, 102 F.2d 58 (7th Cir.), cert. denied, 307 U.S. 648, 59 S.Ct. 1045, 83 L.Ed. 1527 (1939) is inapposite. In that case the telephone company had sought an interlocutory injunction against an Illinois Commerce Commission order requiring reduction of certain of its rates. The interlocutory injunction was granted, conditioned upon an undertaking by the telephone company to refund to its subscribers any sums paid by them in excess of the proposed reduced rates should the company lose its suit. The company had already collected the money and had laid it aside. The Supreme Court eventually ordered the injunction junction dissolved and that refunds be made in accordance with the terms of the injunction. Lindheimer v. Illinois Bell Telephone Company, 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934). The telephone company agreed to undertake the task of making refunds and to assume the costs of the distribution. The payments were not made by the Court, but by the company under the supervision of a representative of the court. 102 F.2d at 61.
 
 
 45
 In this case, unlike Slattery, the potential claimants have no direct business dealings with the parties which plaintiff seeks to hold liable, and therefore defendants are in no position to identify from their own records the potential claimants, let alone calculate the amounts of any refund that they may be found entitled to receive.
 
 
 46
 Here no one can ascertain whether any recovery will be due any particular plaintiff until the case has been litigated, and, if any recovery is decreed, there must follow an enormous number of calculations regarding the dealings of each plaintiff who is entitled to any recovery. And even after that the court would have to pass upon the expenses and fees to be deducted from any recovery.
 
 
 47
 Class actions were not meant to cover situations where almost everybody is a potential member of the class. Nor were they ever intended to compel any court to entertain an alleged controversy with so many potential parties, or to compel any court to entrust the interests of numerous plaintiffs to representation by one plaintiff whose interest is all of $70. Rule 23(b)(3) requires that a class action be superior to other available methods for the fair and efficient adjudication of the controversy, and requires that the court consider 'the difficulties likely to be encountered in the management of a class action' in making its determination. See Berley v. Dreyfus & Co., 43 F.R.D. 397 (S.D.N.Y. Dec. 22, 1967). While this court has determined that dismissal of the class action 'will for all practical purposes terminate the litigation,' 370 F.2d at 121, Rule 23 does not require or contemplate that courts will hear causes of action as class actions merely because they will not get to hear the case any other way. As the Advisory Committee's Note suggests, 'one or more actions agreed to by the parties as test or model actions may be preferred to a class action * * *' If plaintiff's case has any merit and his counsel are of excellent calibre, as he asserts, I see no insuperable barrier to organization by plaintiff, with the assistance of counsel, of a group of members of the purported class to sponsor this litigation as a test case with Mr. Eisen as the sole plaintiff. Even if a test case is not financially expedient from the viewpoint of plaintiff and his legal advisors, its obvious administrative advantages compel me to reject the unmanageable class action as an alternative. See Richland v. Cheatham, 272 F.Supp. 148 (S.D.N.Y. July 27, 1967).
 
 
 48
 Even if plaintiff is unable to maintain an action, when a controversy touches the interest of so many members of the public it is sufficient that Congress has provided a public agency whose duty it is to supervise and regulate such matters. Comment, Recovery of Damages in Class Actions, 32 U.Chi.L.Rev. 768, 785 (1965). The matter of proper commissions to be paid by those who engage in odd-lots transactions is within the jurisdiction of the SEC. It has been the subject of study and in due time the Commission will take appropriate action.
 
 
 49
 The appropriate action for this Court is to affirm the district court and put an end to this Frankenstein monster posing as a class action.
 
 
 
 [1]
 The above figures do not reflect the change made in the differential which was effective as of July 1, 1966. Subsequent to that time the so-called 'breakpoint' was raised to $55, with the differential amounting to 1/8th of a point on stock sold below that figure and 1/4 of a point on stock sold above it
 
 
 [2]
 There was a serious split in court decisions on the subject of the permissibility of 'one-way intervention.' Under this procedure, absent class members in a spurious action were permitted intervene after a favorable judgment, while at the same time they were not bound by an unfavorable decision. Advisory Committee's Note a 105
 
 
 [3]
 The Fifth Circuit has on two occasions been presented with issues under the new rule. However, each of these cases involved aspects of class actions which are similarly handled under both the original and the amended rule 23. In one case the 5th Circuit held that claims could not be aggregated under the new rule to meet the jurisdictional amount in a suit which formerly would have been classified as a spurious action. Alvarez v. Pan American Life Ins. Co., 375 F.2d 992 (5th Cir. 1967). The other case involved a routine denial of a class action because the representative and the class members had conflicting interests in the subject matter of the suit. Anderson v. Moorer, 372 F.2d 747 (5th Cir. 1967)
 
 
 [4]
 'Rule 23. Class actions
 (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.'
 
 
 [5]
 '(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 (1) the prosecution of separate actions by or against indvidual members of the class would create a risk of
 (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
 (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
 (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
 (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.'
 
 
 [6]
 For example, defendants maintain that a purchaser of an odd-lot at a cost below the 'breakpoint' figure might urge that the differential be revised for the benefit of his class (stock selling at $40 or above) at the expense of the other class (stock selling below $40). However, plaintiff, as demonstrated by his answers to interrogatories, has purchased stock at prices both above and below the prevailing break-point. It seems farfetched to argue that plaintiff will adopt a position detrimental to his own interest. If plaintiff does pursure a self-defeating course of conduct, the class action may then be dismissed on the ground that he has filed adequately to represent the entire class. The court is also empowered to divide the present class into appropriate sub-classes. Fed.R.Civ.P. 23(c)(4)
 
 
 [7]
 At various points in its commentary the Advisory Committee has referred to an article written by former Professor (now Judge) Jack B. Weinstein. In speaking of the adequacy of representation question Weinstein has said: 'A class action should not be denied merely because every member of the class might not be enthusiastic about enforcing his rights. * * * The court need concern itself only with whether those members who are parties are interested enough to be forceful advocates and with whether there is reason to believe that a substantial portion of the class would agree with their representatives were they given a choice.' Weinstein, Revision of Procedure: Some Problems in Class Actions, 9 Buffalo L.Rev. 433, 460 (1960)
 
 
 [8]
 Inadvertently the court below did not notice that plaintiff, in answer to interrogatories, specifically listed his transactions in odd-lots. His damages were estimated at $70
 
 
 [9]
 See footnote 5, supra
 
 
 [10]
 Plaintiff does not now claim that 23(b)(1)(B) is applicable
 
 
 [11]
 Rule 23(c)(2):
 'In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.'
 
 
 [12]
 Rule 23(d):
 '(d) Orders in Conduct of Actions. In the conduct of actions to which this rule applies, the court may make appropriate orders: * * * (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; * * *.'
 
 
 [13]
 For example defendants have referred to the different motives present in the following class members: investors, traders, speculators and arbitrageurs
 
 
 [14]
 Defendants have listed 20 different types of orders including, among others, varying forms of limit orders, contingent orders and market orders
 
 
 [15]
 In one of the first articles criticizing old Rule 23, joinder was described as a situation which 'presupposes the prospective plaintiffs advancing en masse on the courts.' Surely that is not the case in the instant action. Kalven & Rosenfield, The Contemporary Function of the Class Suit, 8 Univ. of Chicago L.Rev. 684 (1941)
 
 
 [16]
 'Dismissal of the class action in the present case, however, will irreparably harm Eisen and all others similarly situated, for, * * * it will for all practical purposes terminate the litigation.' Eisen v. Carlisle & Jacquelin, 370 F.,2d 119, 121 (2d Cir. 1966), cert. denied 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967). Judge Kaufman had assumed that $70 would be a reasonable estimate of plaintiff's damages. 'We can safely assume that no lawyer of competence is going to undertake this complex and costly case to recover $70 for Mr. Eisen.' Eisen v. Carlisle & Jacquelin, supra at 120
 
 
 [17]
 Thus the minimum figure would apply where the transaction involves one share of stock selling for a price under $40. The maximum figure would apply where the transaction involved 99 shares selling for a price of $40 or above
 
 
 [18]
 The possibility, as suggested by defendants, that a court may grant attorney's fees in excess of the damages awarded does not provide a meaningful alternative. It is unlikely that a plaintiff with a small claim will undertake complex anti-trust litigation on the remote possibility that a court may award anything like compensatory attorney's fees
 
 
 [19]
 See Kalven & Rosenfield, The Contemporary Function of the Class Suit, 8 Univ. of Chicago L.Rev. 684 (1941); Weinstein, Revision of Procedure: Some Problems in Class Actions, 9 Buffalo L.Rev. 433 (1960); Frankel, Amended Rule 23 From a Judge's Point of View, Symposium on Amended Rule 23, 32 A.B.A. Antitrust L.J. 251-98 (1966)
 
 
 [20]
 Reference is made by Kalven & Rosenfield to the Illinois Bell Telephone Co. rate case where extensive litigation resulted in the actual distribution of about $17,000,000. Over 85% Of the claims were for less than $25 and refunds were made to more than a million people. See Illinois Bell Telephone v. Slattery, 102 F.2d 58 (7th Cir.), cert. denied 307 U.S. 648, 59 S.Ct. 1045, 83 L.Ed. 1527 (1939)
 
 
 [21]
 As previously discussed, it would also be possible to order separate consideration of the question of damages
 
 
 [22]
 See footnote 12, supra
 
 
 [23]
 See Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 398 (1967); Frankel, Amended Rule 23 From a Judge's Point of View, Symposium on Amended Rule 23, 32 A.B.A. Antitrust L.J. 251 at 300. We fail to see any support for the position adopted in School District of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa.1967) that the court itself has the burden of sending out the proper notice
 
 
 [24]
 Affidavit of Sander Landifield, general partner of Carlisle & Jacquelin, offered in support of motion to dismiss class action
 
 
 [25]
 Affidavit of Dean Witter, Jr., general partner in Dean Witter & Co., offered in support of motion to dismiss class action
 
 
 [26]
 Affidavit of Edwin B. Peterson, general partner in Francis I. du Pont & Co., offered in support of motion to dismiss class action