**ALAMEDA OIL COMPANY et al.,
Plaintiffs,**

v.

**IDEAL BASIC INDUSTRIES, INC., et al.,
Defendants.**

**Civ. A. No. C–2201.**

United States District Court,
D. Colorado.

April 15, 1971.

Linde, Thomson, Van Dyke, Fairchild & Langworthy, by Harold T. Van Dyke and Edward W. Kriss, Kansas City, Mo., and Wood, Ris & Hames, by William K. Ris, Denver, Colo., for plaintiffs.

Holland & Hart, by William C. McClearn, Denver, Colo., and Hugh B. Cox, Washington, D. C., for defendants.

### MEMORANDUM OPINION AND ORDER

#### I.

WILLIAM E. DOYLE, Judge.

This suit was commenced on February 2, 1968, in the District Court for the Western District of Missouri. The Court on March 23, 1970, *sua sponte* transferred the case to this District, 313 F.Supp. 164. As presently amended the complaint asserts claims under Sections 10 (b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j (b), 78n(a) (1964) and under state fiduciary law. The asserted claims arise out of the merger on December 31, 1967, of the Potash Company of America and the Ideal Cement Company into a successor corporation named Ideal Basic Industries, Inc. The present question was orally presented on February 26, 1971, and was submitted to the Court on that day.

This suit is currently maintained on behalf of approximately 132 named plaintiffs who allegedly owned Potash stock prior to the merger, and the complaint seeks to maintain the suit on behalf of

all other Potash stockholders similarly situated. This case is presently before this Court on the plaintiffs' application for an order determining this suit to be a class action under Rule 23 of the Federal Rules of Civil Procedure.

## II.

### BACKGROUND

The complaint alleges that on August 28, 1967, the Chairman of the Board of Potash received a letter signed by H. F. Korholz, then Chairman of the Board of Susquehanna Corporation, relating to a possible exchange of stock of Susquehanna for all the issued and outstanding stock of Potash on the basis of one share of Susquehanna $50 convertible preferred stock, convertible at any time into one share of Susquehanna common stock, plus one share of Susquehanna common stock, for each share of Potash stock. This offer was never communicated to the Potash stockholders because, according to the defendants, the letter was withdrawn the same day it was received.

On September 20, 1967, the individual defendants, as Directors of Potash, voted to approve and authorize the execution of a certain Agreement & Plan of Merger by and among Ideal, American Crystal Sugar Company and Potash dated September 20, 1967. Under the terms of said Agreement & Plan of Merger, stockholders of Potash were to receive in exchange for each share of Potash two shares of Ideal Common Stock and 0.27 of a share of Ideal Preferred Stock, $100 par value, convertible into Ideal Common Stock at $23 per share, considering the Preferred Stock at $100 per share for the purposes of such conversion.

On or about October 31, 1967, the directors in attendance unanimously approved the distribution of Potash proxy material which, among other things, recommended approval of the aforementioned merger. The proxy statement did not contain any reference to the allegedly outstanding offer made by Susquehanna.

On December 5, 1967, a special meeting of Potash stockholders was held to vote upon the proposed merger with Ideal, and said Agreement & Plan of Merger was approved by over two-thirds of the outstanding shares of Potash. The plaintiffs contend that approval was obtained because of the defendants' failure to disclose the Susquehanna offer.

The plaintiffs have also made a brief reference (in their first brief supporting their motion for a class action) to an undisclosed December merger proposal made by Korholz after the Potash and Ideal Cement shareholders approved the merger of the two companies. There is no mention of this in the amended complaints and subsequent briefs, nor do the various discussions of liability and damages touch upon it, and it has been asserted during arguments that the plaintiffs' claims relate solely to the nondisclosure of the earlier August offer. Accordingly, it is to be assumed for present purposes that the plaintiffs are not claiming damages for the nondisclosure of the alleged December offer.

According to the plaintiffs, they and all other former Potash stockholders similarly situated were damaged in an amount equal to the difference ($90/share) between the market value (as of the date this action was filed) of the securities offered to be exchanged by the Susquehanna Corporation for each outstanding share of Potash ($146/share) and the price paid, so to speak, that is the market value of the securities actually received or to be received as a result of the merger with Ideal. Total damages for all Potash stockholders would be a tremendous amount. Of the over 1,260,000 shares of Potash stock issued and outstanding prior to January 1, 1968, the plaintiffs herein held a total of over 40,000 shares. Potash had approximately 5,600 stockholders at this time. The defendants dispute the damage formula employed by the plaintiffs as well as the other allegations.

It is further alleged that the defendants' material misrepresentations and nondisclosures violated Section 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(a)

and Rule 10b-5 thereunder, 17 C.F.R. 240.14a-9. Count II alleges a violation of common law fiduciary duties owed Potash stockholders arising out of the nondisclosures and the merger with Ideal.

The defendants contend that a number of the plaintiffs (but not all) purchased their Potash shares as a result of inside information. It is alleged that Herbert Korholz, President of Susquehanna, revealed on a number of occasions throughout 1967 to M. J. Coen, President of the brokerage firm of Midland Securities Co., his interest in acquiring control of Potash. On the basis of his conversations with Korholz, Mr. Coen recommended—especially strongly during the summer of 1967—that his customers purchase Potash stock. Various statements regarding a possible merger between Potash and Susquehanna were related by Coen to his customers. In late August or early September, Coen told Donald Anderson, the vice president of the investment firm of Chiles & Co., that Susquehanna had made an offer to obtain control of Potash and was contemplating a further attempt. In turn, beginning in September, Chiles & Co. made a significant number of purchases for customers who now appear as plaintiffs in this action. The alleged tips are of varying specificity, and originated with different sources.

There has been but slight reference to Section 14(a) of the 1934 Act in the briefs before us. Most of the discussion has centered around Rule 10b-5 for purposes of this Rule 23 motion. The considerations now presented seem similar. *Cf.* Causation and Liability in Private Actions for Proxy Violations, 80 Yale L.J. 107 (1970). The defense of "unclean hands" sought to be used by the defendants against alleged tippee-plaintiffs has arisen in § 14(a) cases. In Pari Delicto and Unclean Hands as Defenses to Private Suit Under SEC Rule 10b-5, 30 Md.L.Rev. 75, 80 (1970).

Assuming that there was a legally sufficient offer and that the defendants owed a duty to disclose, the class—as regards the 10b-5 claim—should be made up of those plaintiffs who held stock when that duty arose (within a reasonable time after the offer was made) and who sold stock thereafter. Those who *sold* their Potash stock *prior* to the duty of disclosure date are not within the class since no 10b-5 violation could possibly have occurred as to them. While those who *bought after* the duty to disclose arose cannot claim inheritance of their sellers' causes of action, it may be that they are includable in the plaintiff class on the theory that the defendants had a *continuing duty* to disclose until the Ideal merger occurred, but not thereafter. However, since the prices at which they purchased were lower than they allegedly would have been had disclosure been made, they may have problems proving damages. That would not bar them from inclusion now.

### III.

### A. CLASS ACTION REQUISITES

■ Rule 23 of the Federal Rules of Civil Procedure has been liberally construed. Thus, even in doubtful cases the maintenance of the class action is favored. Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968); Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968); Contract Buyers League v. F & F Investment, D.C., 48 F.R.D. 7 (N.D.Ill.1969); Dolgow v. Anderson, D.C., 43 F.R.D. 472 (E.D.N.Y.1968). As we said in Gerstle v. Continental Airlines, 50 F.R.D. 213 (D. Colo.1970):

"The theory behind liberal construction of the rule is that determination of the propriety of a class action is to be made at an early stage of the proceedings; thereafter the court maintains the power to supervise the course of the action, and to modify the order as necessary when the facts become developed. If subsequent developments call for it, the court in its discretion can even strike the entire class allegation." *Id.* at 216.

■ Under Rule 23 a class action is proper only if all four separate prerequisites of Rule 23(a) are satisfied

and if in addition the requirements of either Rule 23(b) (1), (b) (2), or (b) (3) are met. The plaintiffs' briefs make it evident that they are relying on (b) (3).

The defendants contend that the present suit does not qualify as a class action on three separate grounds:

1. There are *conflicts of interest* between a majority of the named plaintiffs and the class they seek to represent. Thus, the typicality requirement of Rule 23(a) (3) and the adequate representation requirement of (a) (4) are not satisfied.

2. Common questions of law or fact do not *predominate* over questions affecting only individual members. Rule 23(b) (3).

3. The class action is not *superior* to other available methods of adjudicating the controversy. Rule 23(b) (3).

## B. CONFLICTS OF INTEREST

██ Because members of the class are bound—even though they may not be actually aware of the proceedings—by the judgment in a Rule 23 action unless they affirmatively exercise their option to be excluded, the requirement of adequate representation must be stringently applied. Eisen v. Carlisle & Jacquelin, *supra*; William Goldman Theatres, Inc. v. Paramount Film Distributing Corp., 49 F.R.D. 35 (D.C.Pa.1969); Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y. 1968). In *Dolgow, supra* at 493, the court concluded:

* * * [T]he contention that adequate representation is lacking [is] weighty and "the interests of the affected persons must be carefully scrutinized to assure due process of law for the absent members."

For a party to fairly and adequately protect the interests of a class, due process requires that he may not hold interests which conflict with those of the class whom he seeks to represent. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L. Ed. 22 (1940).

The defendants point to four conflicts between the interests of the *majority* of the named plaintiffs and the interests of the class members which make representation by the former of the latter inappropriate.

██ It is alleged that unlike the class generally a majority of the named plaintiffs are tippees and, consequently, subject to several tippee defenses [1] and are possibly liable to members of the class who sold to them. For several reasons this does not make the named plaintiffs' representation inadequate. First, no such claims have been filed by members of the class against the named plaintiffs.[2] Second, there is a dearth of authority at present which subjects a tippee to liability to individuals who have purchased free of inside information.[3] Third, if such claims were raised, the alleged plaintiff-tippees might stipulate to the "tippee" designation and simply argue the nonapplicability of the associated defenses and claims. Finally, several cases have allowed class actions where there were defenses peculiar to some individual named plaintiffs.[4]

██ The second purported clash of interests arises from the fact that a majority of the named plaintiffs retain proportionately less Ideal Basic stock than do members of the class. Defendants argue that the class plaintiffs are arguably better off if no suit is maintained on their behalf since a recovery might cause them greater injury through damage to the value of Ideal Basic's

---

1. The defendants assert, for example, that the defenses of "unclean hands" and *"in pari delicto"*, adopted by the court in Kuehnert v. Texstar Corp., 412 F.2d 700 (5th Cir. 1969), apply.

2. *See, e. g.*, Fidelis Corporation v. Litton Industries Inc., 293 F.Supp. 164, 170–171 (S.D.N.Y.1968).

3. *See, e. g.*, Note, Tipping Violations and Civil Liability Under Rule 10b–5, 46 Denver L.J. 454 (1969).

4. *See, e. g.*, Fogel v. Wolfgang, 47 F.R.D. 213, 216–217 (S.D.N.Y.1969); Mersay v. First Republic Corporation of America, 43 F.R.D. 465, 468–469 (S.D.N.Y. 1968).

stock than any recovery that they might obtain in this suit. This conflicts with the position of the named plaintiffs, according to the defendants, since they allegedly retain only small amounts of Ideal Basic stock. The defendants' argument is premised on the fact that Ideal Basic is the only *corporate* defendant and that the recovery sought is of great magnitude and is likely to be collectible only from the corporation.

We fail to see the merit in this because it would not prevent uniform representation. If any plaintiff determined that he would be better off with the present merger he could, of course, withdraw. In any event, it is not possible to say that the class recovery, if such a recovery occurs, would exceed any loss that would be suffered due to a decline in the value of Ideal stock. Undoubtedly this possible conflict would occur any time there is a suit against a corporation in which the members of the class own stock.

Nor do we see any serious conflict based on whether the claim is a § 14(a) one or 10b-5. No doubt there are some of the members of the class who would wish to emphasize stock ownership and § 14(b) claims as of October 20, 1967. There is no reason apparent why these plaintiffs could not represent some members of the class.

■ Neither is the alleged conflict between early sellers and late buyers formidable. If there was need for a disclosure, the date of it will have to be determined to the exclusion of persons who were not shareholders as of that date or those who became shareholders thereafter.

## IV.

### PREDOMINANCE QUESTION

■ Finally, we determine whether common issues are predominant. Apart from the possibility that there was no disclosure duty owed to the tippees, we note several common elements which preempt the litgation at this stage. These are as follows:

1. Whether an offer was made (or whether it was withdrawn).
2. Whether there was a duty to disclose the offer.
3. Whether the offer was disclosed.
4. Whether the nondisclosure was material.
5. Whether it caused damage to some or all of the claimants.

As the defendants' strongest defense appears to be that the offer was withdrawn, it can be expected that the issue of whether there was anything material to disclose will be common to all claimants. While the mechanical problem of computing damages will vary, this factor strikes us as relatively unimportant since the computation is merely a matter of arithmetic. Several cases have held that the individual issues of damages and reliance do not prevent a Rule 23 class action, *see, e. g.,* Green v. Wolf Corporation, 406 F.2d 291 at 300–301, especially where a *common course of conduct* is alleged.

The defendants contend that the defenses to which the alleged plaintiff-tippees are subject changes the complexion of the predominance issue. As these defenses involve basically the same facts (going to whether some of the named plaintiffs were tippees), and whether as a matter of law they are barred, this does not as we view it prevent the common questions from predominating.

We consider important the fact that no allegations have been made that differing representations were made to various members of the plaintiff class. In Dolgow v. Anderson, *supra,* the common issues predominated even though different statements had been made to different plaintiffs, and each member of the class had to prove reliance, damages and compliance with the statute of limitations. In Mersay v. First Republic Corporation of America, *supra,* damages, reliance and the statute of limitations were individual questions. Furthermore, the questions whether each class member learned of the misstatements and wheth-

er each had actual knowledge were not common to the class.

[9] This Court has authority to change the course of the litigation if subsequent events indicate that the individual issues will predominate:

> Even if individual questions arise during the course of litigation, which render the action "unmanageable," the court still has the power at that time to dismiss the class action and permit the plaintiff to proceed only on behalf of himself. Fed.R.Civ.P. 23(c)(1). Eisen v. Carlisle & Jacquelin, *supra*, 391 F.2d at 566.

■ Whether the class approach is "superior to other available methods for the fair and efficient adjudication of the controversy" and whether a class action is the superior method of adjudicating this controversy is an area which calls for careful exercise of discretion. See City of New York v. International Pipe & Ceramics Corp., 410 F.2d 295, 298 (2d Cir. 1969).

### V.

### COMMENTS AND DETERMINATIONS

■ It is not apparent that "the individual members of the represented class have interest in having individual control of separate actions" within the meaning of Rule 23(b)(3)(A). There has not been any rush to file suits other than the present one—in fact, only one other solitary case has been filed to date and at this writing it is in all probability too late to institute any such claims. Nor has there been any stampede to join in the present case. Perhaps this is due more to a lack of knowledge than of interest. In any event, we are not faced with possible actions in other jurisdictions and so the action would be concentrated in this District regardless of whether it is to be treated as a class action.

One factor which looms large is the great number of potential small claims and the undoubtedly large number of persons who know nothing of this suit and who, if the case succeeds, would sacrifice their rights if it were not treated as a class action. We are mindful of the fact that once the case is presented as a class action the court has a duty to look to these interests.

All in all, we are of the opinion that the basic requisites for a class action are satisfied and that the arguments against it do not weigh heavily. At the same time, it is our view at this stage at least that plaintiffs should bear the costs of notifying the class, although our judgment on this question could change if the defendants insist on our proceeding on a class basis as to all issues from the very outset.

A final factor which concerns us is the fact that there are not allegations which add up to the most palpable kind of fraud. This makes the Court hesitate to set all of the class action machinery in motion at this time. To do so would be to subject both parties, but especially the plaintiffs, to expense which may be somewhat disproportionate in relation to the intrinsic merits (liability wise) of the case. It would then appear to be the better part of discretion to have a bifurcated trial on the threshold issues at least before proceeding further. If it were to be determined, for example, that there was not a genuine offer or that it was revoked at once or that the defendants did not act with scienter (and we do not attempt to delineate the issues which would be tried at such a trial) the case for all practical purposes would be over. If the plaintiffs were to prevail on these questions, we could then notify the members of the class and go on from there.

We are aware, of course, that the suggested approach is somewhat innovative, but the Rule 23 procedure itself is new and requires such efforts.

We do not rule out variations of the above proposal or other suggestions. The important thing is to bring the litigation under control and proceed to the issues at the earliest possible date.