In re FRONTIER INSURANCE GROUP, INC. SECURITIES LITIGATION.

This document relates to all actions.

No. 94 CV 5213.

United States District Court, E.D. New York.

April 16, 1997.

Wolf Popper Ross Wolf & Jones, L.L.P., New York City (Michael P. Fuchs, of counsel), for plaintiffs Michael C. Eisner and Mendel Kaliff. Co–lead counsel for plaintiffs.

Stull, Stull & Brody, New York City (Jules Brody and Mark Levine, of counsel), for plaintiff Richard Hunken. Co–lead counsel for plaintiffs.

Schoengold & Sporn, New York City (Samuel P. Sporn and Joel P. Laitman, of counsel), for plaintiff Michelle Tuchman. Co–lead counsel for plaintiffs.

Rudolph, Seidner, Goldstein, Rochestie. & Salmon, P.C., Philadelphia, PA (John Ianelli, of counsel), Berger & Montague, P.C., Philadelphia, PA (Sherrie R. Savett, of counsel), for plaintiff Mendel Kaliff.

Abbey & Ellis, New York City (Arthur N. Abbey, Lee Squitieri and Joshua M. Lifshitz, of counsel), Strauss & Troy, Cincinnati, OH (Richard S. Wayne, of counsel), Weisman, Goldberg & Weisman Co., L.L.P., Cleveland, OH (R. Eric Kennedy, of counsel), for plaintiffs Debra G. Simms and Steven Bernstein.

Jaroslawicz & Jaros, New York City (David Jaroslawicz, of counsel), for plaintiff Hindy Taub.

Milberg Weiss Bershad Hynes & Lerach, New York City (David J. Bershad and George Bauer, of counsel), for plaintiff Richard DePuy.

Savett, Fruitkin, Podell & Ryan, P.C., Philadelphia, PA (Barbara A. Podell and Katharine M. Ryan, of counsel), for plaintiff.

Layton Brooks & Hecht, New York City (Daniel J. Brooks, of counsel), for defendants.

NICKERSON, District Judge:

Plaintiffs brought these actions under sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, alleging that defendant Frontier Insurance Group, Inc. (Frontier) and its officers and directors made materially misleading statements about its success in 1994. The cases were consolidated on September 19, 1995.

Seven out of the eight original plaintiffs in the actions move for (1) class certification on

behalf of all persons who bought the common stock of Frontier Insurance Group from February 10, 1994 until November 8, 1994, (2) certification of the moving plaintiffs as class representatives, and (3) certification of co-lead counsel as class counsel. Defendants oppose the motion and urge particularly the inadequacy of the representation of the class by plaintiffs and their attorneys.

### I. The Complaint

The consolidated complaint alleges, in substance, the following.

Frontier, a Delaware corporation with its principal office in Rockhill, New York, is an insurance holding company. Its four wholly owned subsidiaries conduct business as specialty property and casualty insurers, reinsurers and providers of claims adjustment and management services. At the relevant times Frontier common stock has been listed and traded on the New York Stock Exchange. Also named as defendants are the following officers or directors of Frontier: Walter A. Rhulen, Chairman of the Board of Directors and President, Harry W. Rhulen, Vice President, Peter L. Rhulen and Jesse M. Farrow, Vice Presidents and directors, and Dennis F. Plante, Senior Vice President–Finance and Treasurer.

Plaintiffs bought the common stock of Frontier during the period lasting from February 10, 1994 through November 8, 1994 (the class period), in the following amounts and on the following dates: Michelle Tuchman, 100 shares on March 17, 1994 at $38.50 per share and 60 shares on March 18, 1995 at $40 per share; Steven Bernstein, 1000 shares on July 12, 1994 at $33.125 per share; Mendel Kaliff, on behalf of the Mendel S. Kaliff Company Defined Pension Plan and his wife, Gemey Kaliff, 2000 shares on August 2, 1994, 1500 of which at $36.75 per share and 500 of which at $36.875 per share; Debra G. Simms, 100 shares on September 30, 1994 at $29.625 per share; Richard Hunken, 500 shares on October 25, 1994 at $27 per share; Hindy Taub, 100 shares on November 7, 1994 at $26.375 per share; and Michael C. Eisner, 1000 shares on November 3, 1994, 400 of which at $26.25 per share and 600 of which at $26.375 per share.

Plaintiffs allege that in 1993 approximately forty-five percent of Frontier's net premiums was from medical malpractice insurance coverage, the majority of which originating in New York and Florida. In September, 1993, Frontier began writing high risk coverage for physicians who had lost their malpractice coverage due to peer review problems, drug or alcohol problems, or excessive claims.

On February 10, 1994, Frontier issued a press release, which was disseminated by *PR Newswire*, announcing that Frontier recorded a net income of $6.4 million or $0.74 per share in 1993, compared to $5.15 million or $0.72 per share in 1992.

In a Letter to Shareholders published in Frontier's annual report issued on April 21, 1994, defendant Walter A. Rhulen said that the company had "laid the groundwork for a terrific 1994." He said that Frontier approached its high risk medical malpractice insurance coverage "through careful underwriting, intensive risk management and continuing surveillance," and with the knowledge and experience of their Malpractice Underwriting Vice President.

In a press release disseminated by PR Newswire on May 11, 1994, Frontier described its performance during the first quarter of 1994. In pertinent part, the press release said the following:

> Net income in the 1994 period increased 21.6% over the 1993 period, excluding the effect of the 1993 accounting change. The Company's operating income increased to $0.89 per share, an 18.7% increase over the 1993 period. . . .

> As expected, Frontier's net written premiums increased substantially (41.9%) over the comparable 1993 period. This increase is. attributable to growth in the Company's core and new program business, combined with reduced reinsurance costs associated with the Company increasing its net retentions.

> The Company's net investment income in the 1994 period was up significantly (23.3%) over the comparable 1993 period. This increase is primarily attributable to significantly more money being available for investment resulting from the Septem-

ber 1993 public offering of Frontier's common stock and cash inflow from operations, more than offsetting the effect of declining yields available in the marketplace....

Frontier made similar allegations in its quarterly report to the Securities and Exchange Commission on Form 10-Q, signed on May 13, 1994.

On May 20, 1994, Frontier announced a three-for-two stock split payable on June 24, 1994 to shareholders of record on June 6, 1994. The Board also declared a cash dividend of $0.12 per share payable on July 21, 1994 to shareholders of record on June 30, 1994.

On July 19, 1994, the *Dow Jones News Wire* reported that the Standard & Poor's Rating Group raised its credit rating of Frontier from single-A to A-plus, stating that the rating upgrade reflected Frontier's "profitable growth and solid underwriting," in addition to a good investment portfolio.

On August 9, 1994, Frontier reported its financial results for the second quarter and first half of 1994 ending June 30, 1994. The report said, in pertinent part:

> Year-to-date net income in 1994 increased 21.2% over 1993, excluding the effect of the 1993 accounting change, and increased 20.8% for the 1994 quarter ended June 30 over the comparable 1993 quarter. The Company's year-to-date operating income increased to $1.19 per share, a 15.5% increase over 1993, while the operating income for the second quarter increased to $0.60 per share, a 13.2% increase over the comparable 1993 quarter. ...

> As expected, Frontier's net written premiums increased substantially (49.0% year-to-date and 56.5% for the second quarter) over the comparable 1993 periods. These increases were attributable to growth in the Company's core and new program business, combined with reduced reinsurance costs associated with the Company increasing its net retentions....

> The Company's net investment income in 1994 was up significantly (21.5%) year-to-date and 19.7% for the second quarter over the comparable 1993 periods. These increases were primarily attributable to sig-

nificantly more money being available for investment resulting from the September 1993 public offering of Frontier's common stock and cash inflow from operations, more than offsetting the effect of declining yields available in the investment marketplace....

In a Second Quarter 10-Q Form filed with the Securities and Exchange Commission on August 15, 1994, defendants said that, "throughout 1994," Frontier would "increasingly" recognize "the positive impact" of a change in its net premiums. They also said that Frontier's medical malpractice net premiums increased, primarily because of "an increase in the number of physicians insured ... [and] rate increases."

Commencing the very day, May 20, 1994, Frontier announced the stock split and the cash dividend of $0.10 a share, and during the class period, the individual defendants sold shares of their personal holdings of Frontier stock at prices above $30 per share. Peter Rhulen sold 1,000 shares on May 20, 1994; Jesse Farrow, 14,000 shares on August 17, 1994, 1,000 shares on August 18, 1994, 8,100 shares on August 19, 1994, and 8,900 shares on August 22, 1994; and Harry Rhulen, 5,300 shares on September 13, 1994.

On November 8, 1994, Frontier announced it was taking a $17.5 million addition to its loss reserves due to adverse claims developments in medical malpractice insurance in Florida. The company reported a net loss of $5.1 million, or $0.39 per share, for the third quarter of 1994.

On the same day, the *Dow Jones News Wire* quoted Walter Rhulen as saying that "[a] number of steps have been taken to address the Florida loss experience, including rate increases for Palm Beach County and problem physician specialties." He also stated that Frontier planned to open a Florida claims office in Fort Lauderdale by February, 1995.

On November 9, 1994, the price of Frontier common stock fell over $6 a share to a closing price of $19 per share. During the class period, Frontier stock traded at prices as high as $36.75 per share.

Plaintiffs charge that during the first two quarters of 1994 and up to November 8, 1994, defendants knew or recklessly disregarded the facts which led to the loss it reported in November, 1994. Plaintiffs claim that defendants made materially false and misleading statements artificially inflating the price of Frontier common stock, and injuring those who bought the stock during the class period.

On November 9th and 10th, 1994, just after Frontier announced its loss, Richard Hunken, Michelle Tuchman and Michael C. Eisner each filed class action complaints. Thereafter Debra Simms and Steven Bernstein, Mendel Kaliff, Hindy Taub, and Richard DePuy filed suit. The law firms representing the first three plaintiffs—Stull, Stull & Brady, Shoengold & Sporn, P.C., and Wolf Popper Ross Wolf & Jones, L.L.P., respectively—became, by agreement of all plaintiffs' counsel, co-lead counsel for plaintiffs.

## II. Plaintiffs

Defendants press an attack particularly on the participation of plaintiffs Bernstein, Kaliff, and Tuchman as plaintiffs in the action. Accordingly, the court summarizes the facts relevant to the present motions.

### A. Steven M. Bernstein

Bernstein was named plaintiff, along with Simms, on the class action complaint filed by Abbey & Ellis on November 14, 1994. His name was thereafter included on the consolidated complaint signed by co-lead counsel for plaintiffs. Yet Bernstein says that "[t]he preparation and filing of this complaint occurred totally without my knowledge or permission," and that, "[a]s a matter of fact, I have never even discussed the bringing of any such action with any attorney from Abbey &·Ellis (or with any other attorney or law firm)." Aff. of Steven M. Bernstein dated Mar. 4, 1996, at ¶ 1. He continues: "I am astonished and more than a little annoyed that attorneys whom I have never met and with whom I have never spoken would have the audacity to employ my name, without my permission, for the purpose of launching a class action suit intended to benefit them." Id. at ¶ 4.

Abbey & Ellis claims to have received authorization to file on behalf of Bernstein from Barry Pinkowitz, a lawyer who allegedly represented him. The firm received authorization to file on behalf of Simms from Richard Wayne, an attorney at Strauss & Troy in Cincinnati, Ohio. Lee Squitieri, the partner at Abbey & Ellis working on this case, says that he has known and worked with both Mr. Pinkowitz and Mr. Wayne for several years and was confident that their representation would be properly investigated and authorized. Aff. of Lee Squitieri dated Mar. 22, 1996, at ¶ 6.

Mr. Pinkowitz claims that he was "specifically authorized" by·Alison Diamond, whom he "understood to be Mr. Bernstein's financial representative," to commence "a class action on behalf of Steven Bernstein against Frontier Insurance Company." Aff. of Barry Pinkowitz dated Mar. 22, 1996, at ¶ 2. He says that Ms. Diamond provided him "with detailed information concerning Mr. Bernstein's purchase of Frontier stock." Id. Shortly afterward, Pinkowitz contacted Mark Gardy at Abbey & Ellis about bringing suit. Id. at ¶ 3. The record contains no affidavit, declaration, or deposition of Alison Diamond.

It appears that it was on November 11, 1994 that Barry Pinkowitz contacted Abbey & Ellis to file an action on behalf of Bernstein, and that the firm agreed to represent him. Aff. of Lee Squitieri dated Mar. 22, 1996, at ¶¶ 6, 8. Since Abbey & Ellis also agreed to act as local counsel for Strauss & Troy on behalf of Simms, id,, both plaintiffs were named on the complaint. According to Mr. Squitieri, Abbey & Ellis agreed to advance all the expenses of the litigation on behalf of Bernstein and Simms, subject to eventual reimbursement. Id. at ¶ 8, A2. Mr. Squitieri insists that Mr. Pinkowitz does not have a fee sharing arrangement with Abbey & Ellis. Aff. of Lee Squitieri dated Apr. 4, 1996, at ¶ 2; Aff. of Lee Squitieri dated Apr. 3, 1996, at ¶ 5.

Mr. Squitieri admits that, "Mr. Pinkowitz and I never discussed whether he had spoken to Mr. Bernstein about being a plaintiff." Aff. of Lee Squitieri dated Apr. 4, 1996, at ¶ 3. Mark Gardy also did not ask Mr. Pinkowitz about his authorization to act on be-

half of Bernstein. *Id.* Mr. Squitieri concedes that his firm might not have sent Bernstein a copy of the complaint until February, 1996, but says that before then he believed "that the original Complaint had been discussed with Mr. Bernstein or provided to him." He explains that the reason he thought Bernstein knew of the complaint was his "belief that Mr. Pinkowitz was the client contact with whom we were to work" and the fact that his partner Mark Grady had spoken with Mr. Pinkowitz about the complaint. Aff. of Lee Squitieri dated Apr. 3, 1996, at ¶ 6; *see also* Aff. of Lee Squitieri dated Mar. 22, 1996, at ¶ 8, A6. Between November, 1994 and February, 1996, Abbey & Ellis kept Mr. Pinkowitz informed of the progress of the case.

Based upon the supposed authority of Abbey & Ellis, co-lead counsel for plaintiffs included Bernstein as a plaintiff on the consolidated complaint filed on November 28, 1995.

On February 13, 1996, Joshua Lifshitz, an associate at Abbey & Ellis, spoke to Bernstein by telephone to prepare answers to defendants' interrogatories. He says, "This was the first time I had personally spoken to Mr. Bernstein." Aff. of Joshua M. Lifshitz dated Mar. 22, 1996, at ¶ 3. According to Mr. Lifshitz, Bernstein was very cooperative during that telephone conversation and appeared to know about the suit. *Id.* In a follow-up call on February 20, 1996, Bernstein informed Mr. Lifshitz, allegedly "for the first time," that he did not authorize suit against Frontier or its officers and directors. *Id.* at ¶ 6. Thereafter, Mr. Lifshitz contacted co-lead counsel for plaintiffs to seek a voluntary dismissal of Bernstein's action.

In a meeting between defense counsel and co-lead counsel for plaintiffs, defendants refused to sign a stipulation dismissing Bernstein's action. Co-lead counsel for plaintiffs claim that they learned for the first time at this meeting that there was a potential problem regarding Bernstein's authorization to file suit. *See* Aff. of Michael P. Fuchs dated Sept. 16, 1996, at ¶ 7. The problem was confirmed to co-lead counsel within a few days in a telephone conversation between Lee Squitieri and Michael Fuchs of Wolf Popper Ross Wolf & Jones.

## B. *Mendel Kaliff*

Wolf Popper Ross Wolf & Jones, L.L.P. filed the original complaint on behalf of Mendel Kaliff on March 8, 1995 as local counsel for Berger & Montague and Rudolph, Seidner, Goldstein, Rochestie & Salmon, P.C. That complaint alleged that Kaliff "purchased 1,500 shares of Frontier common stock on the open market during the Class Period." In March, 1996, discovery revealed that, in fact, Kaliff had purchased 1,000 shares of Frontier stock on behalf of the Mendel S. Kaliff Company Defined Pension Plan (the Pension Plan), and 1,000 shares on behalf of his wife, Gemey Kaliff.

The named trustee of Pension Plan is Mitchell Kaliff, the son of Mendel Kaliff. Mendel Kaliff is the Chairman, President and Sectretary of the Mendel S. Kaliff Company, as well as the owner of 75% of the equity in the company. He and his son Mitchell are the only shareholders, officers, and directors of the company. Mendel Kaliff Dep. at 7–9. Mendel Kaliff is the beneficiary of 90% of the assets of the Pension Plan. He was the sole trustee of the Pension Plan from its creation in 1987 until October, 1994 when he was replaced as trustee by Mitchell Kaliff. *Id.* at 19–20.

At the time the Frontier stock was purchased in August, 1994, Mendel Kaliff was still the trustee of the Pension Plan. The decision to buy Frontier stock was his. *Id.* at 58, 96–97; *see also* Unsworn Decl. of Mitchell Kaliff dated Sept. 3, 1996, at ¶¶ 4, 5. When Mendel Kaliff heard the news about Frontier's losses, he called his broker, Louis Solomon, and asked to be referred to a lawyer on the east coast. Mendel Kaliff Dep. at 24–25.

Mendel Kaliff says that prior to filing the complaint he discussed bringing suit with his son. *Id.* at 109. He apparently made this statement after a recess in his deposition.

Mitchell Kaliff agrees that his father conferred with him prior to bringing suit and says that he "concurred with the filing of a lawsuit seeking to recover losses on that

investment." Unsworn Decl. of Mitchell Kaliff dated Sept. 3, 1996, at ¶ 6. Mitchell Kaliff also says that, had he known at the time the complaint was filed that the suit should be brought in the name of the Pension Plan, "I would have authorized, and now do authorize, the filing of the complaint." *Id.* at ¶ 7. Mitchell Kaliff is apparently willing to be added or substituted as a plaintiff.

With respect to the Frontier stock bought on his wife's account, Mendel Kaliff says that, because they live in Texas, a community property state, he considers a securities account in his wife's married name, Gemey Kaliff, to be a joint account owned by both of them. He says that he conducts all the trading on the Gemey Kaliff account, and that he purchased the Frontier stock on her account because it contained more money than did the account in his name. Mendel Kaliff Dep. at 33, 54–55, 60, 68.

### C. Michelle Tuchman

The parties do not dispute that Michelle Tuchman is the niece of Samuel P. Sporn, a partner in the firm of Schoengold & Sporn, Tuchman's counsel and one of the co-lead counsel. The firm employs Tuchman's mother as a paralegal and her aunt as a legal assistant. Tuchman previously served as a class representative in *In re T2 Medical, Inc. Shareholder Litig.*, No. 92 CV 1564(RLV) (N.D.Ga.1992), in which the class obtained a substantial recovery.

In March, 1994, Tuchman bought 160 shares of Frontier stock, 100 of which at $38.50 per share and 60 of which at $40 per share, in a custodial account for her daughter at Merrill Lynch. Tuchman makes all the trading decisions in that account for which her husband is the broker. Tuchman Dep. at 20–21. Tuchman says she chose to buy Frontier stock because she is a registered nurse and "like[d] the fact that it was an insurance company which provided medical malpractice [insurance]." *Id.* at 21.

In June, 1994, as a result of Frontier's three-for-two stock split, Tuchman's holdings of Frontier stock rose to 240 shares. On November 20, 1995, she sold 40 shares at $30.75 per share and 20 shares at $31.25 per share.

On November 8, 1994, immediately after Tuchman learned of Frontier's loss announcement from her husband, she called Shoengold & Sporn to institute an action against Frontier. She says that "they are the lawyers I would call in any action that had to do with a class action." *Id.* at 39. Shoengold & Sporn filed a complaint on Tuchman's behalf on November 9, 1994.

### III. Rule 23(a)

Plaintiffs seek certification of the following class:

> all persons or entities who purchased Frontier [Insurance Group, Inc.] common stock on the open market during the period from February 10, 1994 through November 8, 1994, inclusive. Excluded from the Class are the defendants herein, members of the immediate family of each of the Individual Defendants, and any officer, partner, subsidiary, parent or other affiliate of any defendant.

Rule 23(a) of the Federal Rules of Civil Procedure provides that a class may be certified only if the following conditions are met:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of absent class members.

Plaintiffs bear the burden of establishing that the prerequisites for a class action are satisfied. *See, e.g., In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 378 (S.D.N.Y.1996).

In evaluating a motion for class certification, the court accepts as true the substantive allegations in the complaint and does not conduct even a preliminary inquiry into the merits of the case. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. at 378. The court will certify the class only "after a rigorous analysis" of the

conditions of Rule 23(a). *Gen'l Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). Because of the importance of the class action device in securities fraud suits, these conditions are "construed liberally." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir.1990), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991); *see also Green v. Wolf Corp.*, 406 F.2d 291, 295 (2d Cir.1968).

The parties do not dispute that the first two requirements of Rule 23(a), numerosity and commonality, are met in this case. Defendants contest the existence of typicality and fair and adequate representation by plaintiffs and by plaintiffs' attorneys.

### A. Numerosity

■ The numerosity requirement is met. Although the number of potential class members is not yet known, "[p]recise quantification of the class members is not necessary;" rather, "the court may make common sense assumptions to support a finding of numerosity." *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 508 (S.D.N.Y.1996) (citations omitted). The complaint alleges that Frontier had approximately 13 million shares of common stock outstanding and that over 4.6 million shares traded on the New York Stock Exchange during the class period. Common sense suggests that, based on this trading volume, the number of purchasers is sufficiently large to make joinder impracticable. "In securities fraud actions brought against publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Garfinkel v. Memory Metals, Inc.*, 695 F.Supp. 1397, 1401 (D.Conn.1988); *see also Ballan v. Upjohn*, 159 F.R.D. 473, 479 (W.D.Mich.1994).

### B. Commonality

■ Plaintiffs assert that the following questions of law or fact are common to all members of the proposed class:

(a) whether defendants violated Sections 10(b) and 20(a) of the Exchange Act, including SEC Rule 10b–5 promulgated thereunder and/or the common law ...;

(b) whether defendants participated in and pursued, the concerted action or common course of conduct complained of ...;

(c) whether documents, filings, releases and statements disseminated to the SEC and the investing public during the Class Period omitted or misrepresented material facts about the business, finances and prospects of Frontier;

(d) whether the market prices of Frontier's common stock during the Class Period were artificially inflated due to the non-disclosures and/or misleading statements ...;

(e) whether defendants acted knowingly or recklessly in omitting to state material facts, making misleading statements and omissions; and

(f) whether the members of the Class have sustained damages, and, if so, what is the proper measure of such damages.

These questions concerning defendants' liability and class members' entitlement to damages under the securities laws apply to all potential class members. *See generally* 4 Herbert B. Newberg, *Newberg on Class Actions* §§ 22.09–22.10 (2d ed.1985).

### C. Typicality

■ The requirement of typicality, a matter closely related to commonality, is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.) (citations omitted), *cert. dismissed*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); *see also Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981). While the commonality inquiry establishes the existence of a certifiable class, the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions.

Beyond question the named plaintiffs and members of the potential class "share an interest in establishing [defendants'] liability for violations of federal and state law, and achieving the maximum amount of recovery" for the class. *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d at 291. But defendants argue that several of the named plaintiffs are subject to unique defenses rendering their claims atypical of those of the class.

■ While "the mere existence of individualized factual questions" as to the claims of class representatives does not bar class certification, the court may deny certification where the class representatives are "subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp.,* 903 F.2d at 180. The rule barring certification of plaintiffs subject to unique defenses is not "rigidly applied in this Circuit;" in fact, "a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him [or her] that would not impact other class members." *Langner v. Brown,* No. 95 CV 1981, 1996 WL 709757, at *3 (S.D.N.Y. Dec. 10, 1996) (quoting *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 201 (S.D.N.Y.1992); *Werner v. Satterlee, Stephens, Burke & Burke,* 797 F.Supp. 1196, 1213–14 (S.D.N.Y.1992)).

The instances in which courts deny class certification based on defenses uniquely applicable to potential class representatives are generally those where a full defense is available against the plaintiff's individual action or where the potential defenses dovetail with the merits of the class action. *Cf. Langner,* 1996 WL 709757, at *3 (most defenses which successfully defeat certification "attack the heart of the plaintiff's case") (reviewing cases).

For instance, although individual questions of reliance are generally insufficient to defeat class certification, *see Kamerman v. Ockap Corp.,* 112 F.R.D. 195, 198 (S.D.N.Y.1986), one court denied certification where the sole proffered class representative did not rely on either the market or the misleading statements but learned of them before the merger vote allegedly injured the shareholders. *Id.* at 197–98. Another court denied certification

to a plaintiff who allegedly purchased stock based on non-public information he received in a private meeting with the chairman of the board of the corporation. *Beck v. Status Game Corp.,* No. 89 CV 2923, 1995 WL 422067, at *3–*4 (S.D.N.Y. Jul. 14, 1995). Similarly, although it is generally inappropriate to deny certification based on questions going to the credibility of named plaintiffs, *see County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1407, 1416 (E.D.N.Y. 1989), one court denied certification where the named plaintiff was a felon convicted under the very statute invoked in the class action. *Weisman v. Darneille,* 78 F.R.D. 671 (S.D.N.Y.1978).

Defendants claim that the following "unique defenses" should bar certification of class representatives.

First, defendants say that Tuchman is subject to the "unique defense" of "lack of credibility." They claim she is not credible because (1) she did not realize that she sold 60 shares of Frontier stock at a profit, (2) she claims to have bought the stock on her own initiative because she likes to invest in medical malpractice insurance rather than on the recommendation of her broker husband, and (3) she signed an answer to interrogatories containing a typographical error.

■ It is hard to see why Tuchman's failure to notice a typographical error should leave her vulnerable to attacks on her credibility. Nor is it appropriate to infer, contrary to her sworn testimony, from the fact that her husband is a broker that she bought the stock on his suggestion. Tuchman's imperfect recollection and understanding of her investments do not make her an obviously non-credible plaintiff. There is no unique defense sufficient to bar her from serving as class representative.

Second, defendants say that plaintiff Mendel Kaliff is subject to the unique defense of lack of capacity to sue because, when he filed an action against Frontier, he was no longer the trustee of the Pension Plan on behalf of which he had purchased the Frontier stock.

■ Under both New York and Texas law, a suit on behalf of a trust such as the Pension

Plan normally must name the trustee as plaintiff. *See, e.g., Velez v. Feinstein,* 87 A.D.2d 309, 451 N.Y.S.2d 110, 114–15 (1st Dep't 1982); *Hedley Feedlot, Inc. v. Weatherly Trust,* 855 S.W.2d 826, 833 (Tex.App. 1993); *see also Restatement (Second) of Trusts* § 281–82. Thus, Mendel Kaliff lacks the authority to sue on behalf of the trust absent the authorization or participation of the current trustee, Mitchell Kaliff. *See Williams v. Balcor Pension Investors,* 150 F.R.D. 109, 116 (N.D.Ill.1993). The court need not decide whether Mendel Kaliff's 90% beneficial interest in the Pension Plan, the fact that the Plan is funded entirely by employer contributions, or Mitchell Kaliff's asserted grant of agency to his father to bring suit are sufficient to make Mendel Kaliff the real party in interest with capacity to sue on the Pension Plan's behalf. *See id.* Nor does the court decide whether Mendel Kaliff has authority to bring suit on the Gemey Kaliff account.

Co-lead counsel for plaintiffs have offered to cure any defects in Kaliff's authority by adding or substituting the appropriate plaintiff. Mitchell Kaliff claims to have ratified the filing of this action and appears to be willing to join as plaintiff. The record does not show whether or not Gemey Kaliff is a willing or necessary party to this action. The court will grant plaintiffs, within thirty days of the date of this memorandum and order, leave to amend the consolidated complaint to add or substitute the proper named plaintiff or plaintiffs, and/or to file a brief explaining the legal basis for why such an amendment is not necessary. Within thirty days thereafter, defendants may file any objections they have to any new class representatives.

Third, defendants contend that plaintiffs Taub, Eisner, and DePuy are subject to the "unique defense" of "non-reliance on the market."

■ The "fraud on the market" theory, on which plaintiffs rely in part, creates a rebuttable presumption that investors purchased Frontier stock in reliance on the integrity of the market. *Basic, Inc. v. Levinson,* 485 U.S. 224, 241–44, 108 S.Ct. 978, 988–90, 99 L.Ed.2d 194 (1988); *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (reliance presumed once materiality established). Defendants can rebut this presumption by showing that plaintiffs relied not on the market but on some source not dependent on the market. For the purposes of this motion, the court assumes the market for Frontier stock is an efficient one incorporating all public information about the company.

Defendants say that the fact that Taub purchased Frontier stock after filing this lawsuit shows she relied on sources other than the integrity of the market and is sufficient to rebut the presumption of reliance. The court disagrees.

■ Taub claims she purchased more Frontier stock after November 8, 1994 because her husband "felt that all the information had come out at that point and that he would try to recoup some of the money." Hindy Taub Dep. at 86. The fact that Taub attempted to recoup her losses by *continuing* to purchase Frontier stock after the disclosure of the alleged misrepresentations has no bearing on whether or not she relied on the integrity of the market during the class period. *See, e.g., Kronfeld v. Trans World Airlines, Inc.,* 104 F.R.D. 50, 53 n. 4 (S.D.N.Y. 1984); *Garfinkel,* 695 F.Supp. at 1404. *But see Greenspan v. Brassler,* 78 F.R.D. 130, 132–33 (S.D.N.Y.1978). There is no further evidence in the record to support a conclusion that Hindy Taub invested in Frontier for purely speculative reasons "independent of market information." *Cf. Koenig v. Benson,* 117 F.R.D. 330, 336 (E.D.N.Y.1987).

■ Defendants also purport to rebut the presumption of reliance with respect to plaintiffs Taub, Eisner, and DePuy because each bought the stock on the advice of a broker who had telephoned Frontier's offices directly to inquire about the company. Defendants do not claim that plaintiffs' brokers got inside information from those agents. There is no evidence that the brokers received any information not available to members of the public who contacted Frontier's offices. Absent any indication to the contrary, it is fair to assume that the information provided by Frontier agents to members of the public

over the telephone lines was public information incorporated into the market price of Frontier stock. Defendants have not rebutted the presumption that Taub, Eisner, and DePuy relied on the integrity of the market.

Finally, defendants say that Tuchman is vulnerable to a defense that she bought the stock before any duty to disclose could have arisen. Tuchman bought during the first quarter of 1994. Defendants say that there is normally no duty to disclose financial data for the fiscal quarter in progress. According to defendants, interpretation, plaintiffs' theory of the case is that Frontier misrepresented material facts beginning with its results for the first quarter of 1994. Thus, defendants argue, Tuchman is an inappropriate plaintiff because she was not defrauded by the scheme alleged in the complaint.

█ This objection to Tuchman's participation in the action is premature. To decide whether the dates of Tuchman's stock purchase bar her recovery, the court would have to determine when defendants' duty to disclose developed. That is a question concerning the merits of the case. An inquiry into the merits is inappropriate on a motion for class certification. *See, e.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.1982) ("it would be improper for a district court to resolve substantial questions of fact going to the merits when deciding the scope or time limits of the class").

█ Moreover, the complaint charges defendants with an act of misrepresentation in February, 1994, over one month before Tuchman made her purchase. On the face of the complaint Tuchman falls within the class period. The typicality requirement does not disqualify Tuchman from serving as class representative even if it is later determined that her date of purchase indeed prevents her from recovering damages. *See Langner,* 1996 WL 709757, at *3.

### D. Adequacy of Representation

█ To qualify as adequate class representatives plaintiffs must meet two basic conditions. First, potential class representatives must not have interests that are "adverse" to those of other class members. Second, class counsel must be " 'qualified, experienced, and generally able' to conduct the litigation." *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992) (quoting *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)); *In re Joint Eastern & Southern Dist. Asbestos Litig.,* 78 F.3d 764, 778 (2d Cir.1996) (quoting same); *cf. Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975) (Rule 23(a) is met "where it is unlikely that segments of the class [plaintiff] represents would have interests conflicting with those she [seeks] to advance, and where the interests of that class [are] competently urged."). Whether the named plaintiffs can fairly and adequately represent the interests of the class is a question committed to the discretion of the court. *Malchman v. Davis,* 761 F.2d 893, 899 (2d Cir. 1985).

### 1. Absence of Conflicting Interests

Like other class members, plaintiffs are interested in establishing defendants' liability. Defendants suggest that intra-class conflicts may arise with respect to the amount and allocation of the potential damages.

█ Defendants first say that Tuchman has an inherent conflict of interest with other class members because she is the niece of Samuel Sporn, a partner in a firm seeking to be certified as class counsel. Defendants argue that Tuchman's family relationship with class counsel creates an incentive for her to accept a settlement not in the best interest of the class but beneficial to counsel.

Defendants point to no evidence, but assert that the conclusion is "inescapable," that she was named as a nominal plaintiff solely so that her uncle's firm might become lead counsel. *See Ballan,* 159 F.R.D. at 488 (denying representation on that ground). But Tuchman testified that she filed suit on her own initiative. *See* Tuchman Dep. at 39, 46. Defendants present no evidence that she will share in the attorney's fees recovered by class counsel. *See Susman v. Lincoln Am. Corp.,* 561 F.2d 86 (7th Cir.1977) (denying representation on that ground).

Any concerns with respect to Tuchman's independence from class counsel are mitigated by the fact that there are six other named plaintiffs in this action, none of whom has any familial relationship with counsel. Since there is no *per se* rule against relatives of class counsel serving as class representatives, *see, e.g., Malchman,* 761 F.2d at 899, and nothing suggests an appearance of collusion or impropriety, *see Lewis v. Goldsmith,* 95 F.R.D. 15, 20 (D.N.J.1982) (no impropriety in similar circumstance), Tuchman is not disqualified from serving as a class representative just because of her relation to class counsel.

■ Defendants also say that there are likely to be conflicts between class members who have sold their Frontier holdings and those who are still shareholders because a substantial settlement may harm the interests of the latter group by devaluing their current holdings. This objection relates to damages and not to the determination of whether defendants are liable under the securities laws. Potential conflicts between class members who have sold their Frontier stock and those who have not are best resolved after the liability phase of the litigation, through "the normal pull and tug of factions within the class itself," *In re Painewebber Ltd. Partnerships Litig.,* No. 94 CV 8547, 171 F.R.D. 104, 123 (S.D.N.Y.1997), through the creation of subclasses, *see generally Eisen,* 391 F.2d at 566, 4 *Newberg on Class Actions* § 22.30, or through the mediation and supervision of the court.

Moreover, the fact that DePuy and Tuchman still own shares of Frontier stock means that the interests of stockholders are not likely to be slighted in favor of those who have sold. Should a conflict arise later in this litigation or should a representative act not in accordance with the interests of the class, the court, which must ensure that the interests of all class members are fairly represented, *see, e.g., In re Painewebber Ltd., Partnerships Litig.,* 171 F.R.D. at 123, will then address the matter. *See e.g.,* Federal Judicial Center, *Manual for Complex Litigation* § 30.16 (3d ed.1995) (representative may

be replaced if she engages in conduct prejudicial to interests of class).

### 2. Competence of Class Counsel

■ As their firm resumes demonstrate, the three firms seeking to be certified as class counsel are experienced in securities litigation and well qualified to represent the class. But, in determining the adequacy of counsel, the court looks beyond "reputation built upon past practice" and examines counsel's "competence displayed by present performance." *Ballan v. Upjohn Co.,* 159 F.R.D. 473, 487 (W.D.Mich.1994) (citations omitted).

Defendants say that the performance of co-lead counsel for plaintiffs demonstrates their inadequacy to serve as such. They complain that plaintiffs' counsel failed to conduct an adequate pre-filing investigation of the allegations of the complaint and to remedy their errors in a timely fashion.

■ Adequate representation requires that counsel conduct a reasonable inquiry into the facts underlying the allegations in any pleading, motion, or other document filed with the court. Rule 11 of the Federal Rules of Civil Procedure provides that the signature of an attorney certifies, among other things, that "to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances, ... the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). This duty of investigation is non-delegable. *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 125, 110 S.Ct. 456, 459, 107 L.Ed.2d 438 (1989).

■ Defendants fault co-lead counsel for their conduct in the Bernstein affair, and say they must bear responsibility for the lack of authorization from him to file suit because they signed the consolidated complaint bearing his name. In essence, defendants say that Abbey & Ellis' failure to substantiate the authorization of their purported client taints co-lead counsel for plaintiffs. Al-

though none of co-lead counsel ever claimed to represent Bernstein personally, defendants say that he "became their client" when they signed the consolidated complaint. The court disagrees.

The cases cited by defendants stand for the proposition that a signing attorney may not discharge his or her duty to investigate the facts underlying a complaint by relying solely upon the inquiry conducted by another attorney, *see, e.g., id.,* or by another firm, *see, e.g., Greenfield v. U.S. Healthcare, Inc.,* 146 F.R.D. 118, 124 (E.D.Pa.1993), *aff'd sub nom Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274 (3d Cir.1994), or by relying on some other source. *Id.* In *Pavelic & LeFlore,* the attorneys raised a claim that "had no basis in fact and had not been investigated sufficiently by counsel." 493 U.S. at 122, 110 S.Ct. at 457. The signing attorneys in *Greenfield* conducted only a cursory investigation and relied almost completely on a complaint filed by another firm for the facts underlying the class action claims. 146 F.R.D. at 124–25. Similarly, the attorneys in *In re Kunstler,* 914 F.2d 505 (4th Cir.1990), shirked their responsibilities independently to inquire into the facts forming the basis of their claims. The complaint contained several claims without factual or legal foundation, *id.* at 517, as well as "numerous irrelevant, unsubstantiated, and sensational allegations." *Id.* at 515.

Defendants cite no case in which the signing attorneys were held responsible for investigating the attorney-client relationship between a plaintiff and his or her individual counsel. It would be improper to impose upon counsel a duty to verify the relationship between named plaintiffs and the attorneys who represent them. Such a requirement might interfere with the confidentiality of the attorney-client relationship or with counsel's ethical obligation to avoid communicating directly with a person he or she knows to be represented.

Absent any reasonable indication of a problem, an attorney may legitimately rely on the representation by another attorney that he or she is authorized to act on behalf of a client. In this case, even though Abbey & Ellis may be held responsible for their failure adequately to verify their authorization to represent Bernstein, co-lead counsel are not rendered inadequate class counsel by virtue of their reliance on Abbey & Ellis' assurances that they were so authorized.

Second, defendants claim that a proper investigation by Wolf Popper Ross Wolf & Jones, L.L.P. and the other firms representing Mendel Kaliff would have revealed that he never personally owned Frontier stock.

Plaintiffs say that Kaliff's personal attorneys reasonably relied upon their client's statements that he was the trustee of the Pension Plan, *see* Kaliff Dep. at 15–16, and that he had power of attorney over the Gemey Kaliff account because it was community property, *see id.* at 55–56, 60. "Blind reliance on the client is seldom a sufficient inquiry" into the factual basis of a complaint. *Id.* at 514 (quoting *Southern Leasing Partners, Ltd. v. McMullan,* 801 F.2d 783, 788 (5th Cir.1986)). Nevertheless, an attorney "is entitled to rely on his or her client's statements as to factual claims when those claims are objectively reasonable." *Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1479 (2d Cir.1988), *rev'd in part on other grounds sub nom Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). While the most prudent and diligent course would have been for the attorneys independently to verify Kaliff's authority to sue on behalf of the Pension Plan and the Gemey Kaliff account, their reliance on Kaliff's statements was not so unreasonable as to undermine class certification.

According to Michael Fuchs, a member of one of the co-lead counsel, Wolf Popper Ross Wolf & Jones, L.L.P., Sherrie Savett of Berger & Montague called him on March 8, 1995 to request that Wolf Popper file a complaint as local counsel for Kaliff. Aff. of Michael P. Fuchs dated Sept. 16, 1996, at ¶ 10. She told him that Kaliff had purchased 1,500 shares of Frontier stock during the class period and that he authorized the filing of the lawsuit by Berger & Montague and John F. Ianelli as his counsel. *Id.* Mr. Fuchs agreed to act on Kaliff's behalf "based upon [his] knowledge and prior experiences with Sherrie Savett, Berger & Montague and John F. Ianelli." *Id.*

Plaintiffs say that Mr. Fuchs properly relied on the information provided by forwarding counsel. But unlike the more distant relationship between co-lead counsel and Bernstein, Wolf Popper signed the complaint directly on behalf of Mendel Kaliff, thereby representing to the court that he was their client. As noted above, a signing attorney cannot delegate his or her responsibility to another attorney to investigate the facts underlying the complaint. Mr. Fuchs improperly relied solely upon a conversation with forwarding co-counsel to provide the basis for adding Kaliff's name to the complaint. Similarly, counsel failed to make a proper inquiry into Kaliff's authority to file on behalf of his wife and the Pension Fund.

Nevertheless, the court finds counsel's oversight insufficient to bar certification of class counsel. There is no suggestion that Wolf Popper did not do a good job investigating the substantive allegations of the complaint relating. Nor do defendants complain that Wolf Popper failed properly to investigate the adequacy of Simms, named on the same complaint as Kaliff, as a named plaintiff. Counsel's investigation into Mendel Kaliff's actual authority to file on behalf of the Pension Plan and the Gemey Kaliff account concerns issues collateral to the central factual predicates of the complaint. Wolf Popper already had a fully investigated complaint by the time they added Kaliff as a plaintiff. Any problem regarding Kaliff's authority to file suit may be easily remedied. The court concludes that Wolf Popper's errors are not fatal to the motion for certification as class counsel.

Finally, defendants argue that it was improper for co-lead counsel to have included Tuchman, the niece of attorney Samuel Sporn, on the complaint. As stated above, defendants have not demonstrated anything improper about Tuchman serving as a class representative.

Defendants rely largely on *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 489 (W.D.Mich. 1994), to support their contention that co-lead counsel for plaintiffs should not be certified because they "have done an appalling job of selecting class representatives." The attorneys have by no means engaged the egregious conduct shown in *Ballan*. There the attorneys for plaintiffs named as class representatives one fictitious person, one person who did not buy the stock at issue during the class period, the wife and son of counsel, both of whom were dropped from the case once his firm was made lead counsel, and several others who either withdrew or were dismissed for failing to comply with discovery. *Id.* at 488–89. By the time plaintiffs moved for class certification, seven out of the eight law firms involved no longer had clients in the case. *Id.* at 491. In this case only one of the eight original plaintiffs has sought to dismiss his action. This court has found a possible fault with only one other but has granted plaintiffs leave to amend to correct that defect.

In sum, while co-lead counsel for plaintiffs have made mistakes, those mistakes do not seriously draw into question their ability to conduct the litigation and vigorously prosecute the action on behalf of the class.

### 3. Qualifications of Plaintiffs

Defendants argue that plaintiffs should not be certified as class representatives because none will fairly and adequately protect the interests of the absent class members. According to defendants, plaintiffs are both unwilling and unable to supervise their attorneys in prosecuting the action.

■ The court may properly deny class certification where the plaintiffs "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Maywalt v. Parker & Parsley Petroleum Co.* 67 F.3d 1072, 1077–78 (2d Cir.1995) (citation omitted). But "in the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance or credibility are rarely appropriate." *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1416 (E.D.N.Y.1989) (Weinstein, J.) (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370–74, 86 S.Ct. 845, 849–51, 15 L.Ed.2d 807 (1966)); *see also In re TCW/DW North Am. Gov't Income Trust Securities*

*Litig.*, 941 F.Supp. 326, 341 (1996) (court should "not deny any proposed representative's motion for certification solely because their lack of knowledge about the case makes them unable to supervise their attorney"); 4 *Newberg on Class Actions* § 22.19 ("[C]hallenges by the defendant to the personal qualifications of a representative plaintiff who is not required to have a detailed understanding of the securities field is generally unwarranted and only serves to prolong already protracted litigation.").

Courts that have denied class certification based on the inadequate qualifications of plaintiffs have done so only in flagrant cases, where the putative class representatives display "an alarming unfamiliarity with the suit," *Greenspan v. Brassler*, 78 F.R.D. 130, 131 (S.D.N.Y.1978); *Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y.1987) (citing same), display an "unwillingness to learn about" the facts underlying their claims, *Levine v. Berg*, 79 F.R.D. 95, 98 (S.D.N.Y.1978), or are so lacking in credibility that they are likely to harm their case, *see Panzirer v. Wolf*, 663 F.2d 365 (2d Cir.), *vacated on other grounds*, 458 U.S. 1105, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982).

 None of these circumstances is present here. Defendants isolate some quotes from plaintiffs' deposition transcript suggesting that several of them did not understand the legal strategies in this case, only recently fully read their complaints, did not consider the problems attending the participation of eleven law firms in this action, had imperfect recollections of their investments, and did not fully comprehend their duty to supervise class counsel.

But even in a class action, plaintiffs are not required to understand the meaning of complex legal terms or to direct litigation strategies. As one court said: "The law does not require the named plaintiff to possess an extensive knowledge of federal securities laws or even complete familiarity with all of the particulars of the pending lawsuit. It is enough that the class representative is aware of the basic facts underlying the lawsuit as alleged in the complaint and does not abdicate his obligations to fellow class members." *Michaels v. Ambassador Group, Inc.*, 110

F.R.D. 84, 90 (E.D.N.Y.1986). The named plaintiffs have demonstrated sufficient familiarity with their claims to meet this standard.

The deposition testimony, read in its entirety, does not indicate that the participation of the named plaintiffs in this action will be "so minimal" that they will "virtually ... abdicate[ ] to their attorneys the conduct of the case." *Ballan v. Upjohn*, 159 F.R.D. at 486. There is nothing in the depositions to show that those plaintiffs are unwilling to supervise their attorneys to the extent required by law. The court directs counsel for plaintiffs, if they have not already done so, to explain to their clients that named plaintiffs have an obligation to oversee the conduct of their attorneys and to guard against any overreaching or other conflict.

The court declines to impose the stringent standards of knowledge and performance on class representatives that defendants recommend. Such strict standards for class certification would leave aggrieved shareholders, most of whom are not expert litigants and possess only a small stake in the outcome of the suit, without a remedy and would severely undermine the usefulness of the class action device in securities actions. *See generally Dura–Bilt*, 89 F.R.D. at 103 ("To require the class representative to be sophisticated and knowledgeable enough to help counsel ... would reduce the class action device ... to an impotent tool."); *Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y.1987) ("What is crucial is the competence of counsel, and the named plaintiffs require only a basic knowledge of the facts."); 1 *Newberg on Class Actions* § 1.05.

 Defendants urge the court to follow the lead of the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737 (Dec. 22, 1995) (codified at 15 U.S.C. §§ 77 *et seq.*), in imposing heightened requirements on class representatives in class actions alleging securities fraud. Defendants do not nor could they responsibly argue that the Reform Act should be retroactively applied in this case. *See* 15 U.S.C. §§ 77l note & 77k note; *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The standards and

reasoning of that act may not be applied piecemeal to a case brought prior to its passage.

Defendants are essentially concerned that, by abdicating responsibility for prosecuting the action to class counsel, plaintiffs will not be able to protect class members in the event of a conflict of interest between class members and class counsel. Specifically, defendants fear that skyrocketing legal costs will detract from class members' potential recovery. Defendants fears are without a substantial basis. "The ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d at 1078 (citing, *inter alia, In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1438 (2d Cir.1993)).

"Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation." *Gen'l Tel. Co. of Southwest*, 457 U.S. at 160, 102 S.Ct. at 2372. Under both the lodestar method for calculating attorney's fees and the *Civil Justice Expense and Delay Reduction Plan* (effective in E.D.N.Y. Dec. 16, 1991), pursuant to which attorney's fees are awarded according to a variable percentage of recovery in a settlement, the court exercises discretion in setting a reasonable amount of attorney's fees and takes into account unnecessary delays or duplication of work. *See, e.g., Sands v. Runyon*, 28 F.3d 1323, 1333 (2d Cir.1994) (excessive or redundant fees subtracted under lodestar approach); *In re Crazy Eddie Securities Litig.*, 824 F.Supp. 320, 326 (E.D.N.Y.1993) (citing factors considered in determining appropriate percentage to award as fee).

Moreover, absent class members may intervene to protect their interests or avoid the binding effect of a judgment by opting out of the class, by challenging the adequacy of representation during the course of the litigation, or by attacking the fairness of a settlement. *See Eisen*, 391 F.2d at 562.

In sum, the court is satisfied that the named plaintiffs are capable of exercising independent judgment and will adequately represent the interests of the class. The court will continue to monitor their performance as the case progresses.

## *IV. Rule 23(b)*

Plaintiffs must satisfy, in addition to the four prerequisites of Rule 23(a), the requirements of at least one of the subdivisions of Rule 23(b). Plaintiffs rely on subdivision (3) of Rule 23(b), which provides that a class action may be maintained if:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3).

██ Defendants do not dispute that the common questions of law and fact, discussed with respect to Rule 23(a)(2), predominate over individual questions in this action. The only individual questions are the extent to which each class member relied on defendants' alleged misrepresentations and the determination of damages for each class member, neither of which is sufficient to defeat class certification. *See, e.g., Korn v. Franchard Corp.*, 456 F.2d 1206, 1212 (2d Cir.1972) (individual questions of reliance do not preclude certification); *Dura–Bilt*, 89 F.R.D. at 96 (citing cases); *Eisen*, 391 F.2d at 566 (class differences bearing only on computation of damages do not justify dismissal of class action); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382 (S.D.N.Y. 1996) (individualized determination of damages does not preclude certification).

A class action is superior to other methods of adjudication of the present dispute. None of the factors mentioned in Rule 23(b)(3) that might cast doubt on that conclusion is present. The court has not been made aware of any class members with an interest in "individually controlling the prosecution ... of separate actions," Rule 23(b)(3)(A), or any other pending "litigation concerning [this] controversy," Rule 23(b)(3)(B).

It serves the interest of justice to resolve the common disputes of potential class mem-

bers in one forum. *See* Rule 23(b)(3)(C). Securities fraud disputes are commonly litigated as class actions, and there is nothing to suggest that this case will present greater "difficulties . . . in the management of a class action." Rule 23(b)(3)(D).

This class action is not only the superior method of adjudication. It is currently the only reasonable available method to resolve the dispute. *See Korn*, 456 F.2d at 1214. This is a case where " 'the interests of individuals conducting separate lawsuits' are more 'theoretical than practical' since 'the amounts at stake for individuals [are] . . . so small that separate suits would be impracticable.' " *Eisen*, 391 F.2d at 555–56 (citing Advisory Committee Note).

### V. Conclusion

Plaintiffs' motions for class certification and certification of class counsel are granted. Plaintiffs' motion for certification of named plaintiffs as class representatives is granted, except that Mendel Kaliff shall not be included among the class representatives until approved by this court after amendment of the complaint or further briefing.

So ordered.